Docket No. 103768.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARIANO LOPEZ, Appellant.

*Opinion filed June 19, 2008.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by Justice Burke.

## OPINION

Defendant, Mariano Lopez, was charged with first degree murder, armed robbery, home invasion, attempted aggravated arson, and aggravated unlawful restraint. He gave a handwritten statement confessing to the crimes, which was used against him at trial. Defendant was convicted in the circuit court of Cook County and sentenced to a total prison term of 23 years. The appellate court affirmed. 367 Ill. App. 3d 817. We granted defendant's petition for leave to appeal (210 Ill. 2d R. 315) and now consider whether the trial court erred in denying defendant's motions to quash arrest and

suppress evidence. For the reasons that follow, we reverse and remand.

## BACKGROUND

On the morning of July 14, 1998, police responded to a report of a burglary at the apartment of the victim, Hector Andrade. Upon entering the apartment, police found the victim's dead body on the living room floor in a pool of blood. The victim had been stabbed numerous times and his arms, legs, and head were bound with duct tape. A large-blade knife was found near his body. The apartment smelled of gas, burned-out cigarettes were found near the body and on top of an entertainment center, and the apartment appeared to have been ransacked. Defendant, who was 15 years old at the time, gave both oral and written statements confessing to his part in the crime.[1] Prior to trial, defendant filed motions to quash arrest and suppress the oral and written statements he made to authorities. The trial court conducted separate hearings on defendant's motions to quash arrest and suppress statements.

The evidence presented at the hearing on defendant's motion to quash demonstrated that detectives went to defendant's apartment at approximately 12 p.m. on July 28, 1998, after defendant's name was brought up while detectives were investigating the victim's murder. Defendant testified that he was asleep when two police officers arrived at his apartment. His mother woke him, and he went into the kitchen. One officer was standing in the kitchen and the other officer was in the doorway of the apartment. The officer in the kitchen told defendant to put his shoes on because they were going to the police

---

[1] Codefendants Jose Leal and William Andrade, who was known as "Chucky," also confessed. Leal was convicted of first degree murder and sentenced to 23 years' imprisonment. His conviction and sentence were affirmed on appeal. *People v. Leal*, No. 1–03–2226 (2006) (unpublished order under Supreme Court Rule 23). Andrade (who is not related to the victim, Hector Andrade) was convicted of first degree murder, home invasion, and aggravated unlawful restraint. He was sentenced to 40 years' imprisonment. The appellate court affirmed. *People v. Andrade*, No. 1–01–1719 (2003) (unpublished order under Supreme Court Rule 23). Leal and Andrade are not parties to this appeal.

station. The officer grabbed defendant and said, "You're going with us." The officer also pushed defendant two to three times, but did not push hard. The officers did not tell defendant they were investigating a homicide; they told him they wanted to ask him questions about gangs. Although one of the officers was speaking to defendant's mother in Spanish, he did not tell defendant's mother that she could accompany defendant to the police station. Defendant stated that he went with the officers because, "I thought I had to go." When the officers escorted defendant out of the back door of his apartment, he noticed that another police officer was waiting outside with his gun drawn. Defendant stated that he was placed in the backseat of an unmarked police car but was not handcuffed. Both officers sat in the front seat. The third officer followed behind in a marked squad car. The officers accompanying defendant did not draw their guns at any time.

When he arrived at the police station, defendant was placed in a room and questioned about Hector's murder. Defendant testified that he was in the room for three to four hours and was questioned "all the time" he was in the room by three officers, except "[t]here would be like two minutes they would go out and they would come right back." He explained that he was only left alone for a short period of time and the officers never left to investigate any of the information he provided to them. Defendant was not handcuffed during this questioning, but the door to the room was closed, and defendant believed it was locked from the outside with a slide lock. Defendant was never told that he was free to leave and defendant did not feel that he was free to go. Defendant did not see his parents until he signed the handwritten statement admitting to the crime. After he gave the signed confession, he was allowed to see his father. Defendant's father then signed the statement in defendant's presence. Defendant stated that he was allowed to use the restroom and was offered food, although he did not accept any.

Defendant's mother, Maria Luisa Garcia, testified that she was at home with defendant, who was sleeping in his bedroom, and her 18-year-old daughter, who was sleeping in the living room, when two men knocked on the door. She answered the knock and one man said, in Spanish, that he was a detective and then asked about her son. The detective announced, "I'm going to take him." He also said: "I come

for Mariano. I'm going to ask him some questions. *** He has to cooperate with us." Garcia stated that she did not respond to the detective; in fact, she did not speak to him at all. Even though Garcia did not invite the detective in and did not give him permission to enter, he and the other man walked into the kitchen area of her apartment. The other man did not identify himself and Garcia did not know whether he was a police officer. She thought he was "American" but could not be sure of his race.

Garcia explained that the apartment was "very small." When the detective and the other man entered the kitchen, defendant heard them and came into the kitchen, without being called. The detective ordered defendant to put his shoes on and said, "Let's go."According to Garcia, the officers stood in her kitchen for approximately 30 minutes, without speaking to her, while defendant got dressed and put his shoes on. When defendant was ready to leave, the detective gave defendant a slight push, but "didn't hurt him." The detective and the other man then took defendant out of the apartment. Defendant was not handcuffed.

Garcia initially stated that she asked the detective "where are you taking him, why are you taking him," but the detective would not answer. Later, Garcia testified that she never spoke to the detective after their initial conversation at the door of her apartment and that he never spoke to her. Garcia indicated that the detective never advised defendant that he did not have to go and never told Garcia that she could accompany her son. Garcia did not ask if she could accompany her son to the police station. Further, she did not give detectives permission to take her son, although she did not object. The detective gave Garcia a business card with his name and telephone number before leaving with defendant.

Garcia testified that her daughter remained in the living room and never entered the kitchen while the detectives were there. Garcia initially testified that her daughter was sleeping during this time, but later testified that her daughter was in a hurry to get to work and, therefore, did not participate in the encounter with the detectives at the apartment.

Garcia stated that she contacted her neighbor, Lydia Villanueva, after the detectives left with defendant. Villanueva speaks English and Garcia asked her to call the number left by the detective. Garcia

did not attempt to call herself because she does not speak English and because she was crying and upset. Villanueva came over at around 3 p.m. and called the number on the detective's business card. Villanueva spoke to a detective, who told her that "he could not say anything." After that initial call, Villanueva called the police station more than five times to inquire about defendant. She could not get any information.

Garcia testified that her husband returned home from work around 6:30 p.m. She did not have any information about her son or his whereabouts at that time. Garcia explained that her husband left and went to look for defendant because "this detective would not tell us anything." Garcia first indicated that she did not see any police officers again that day. However, when asked a second time, Garcia testified that a detective called her at 9 p.m. and asked permission to return to her apartment to search it. She gave him permission. At 10 p.m., the same men who came to her apartment earlier in the day returned and searched. At that point, Garcia's husband had returned after unsuccessfully attempting to locate defendant at various police stations. After they searched and were unable to find anything, the detectives offered to bring her to the police station to see her son. She did not go because she was too upset. Her husband went instead.

Defendant's father, Mariano Lopez, Sr., testified that he was at work and was not aware of the events of the day until he came home at 6:30 p.m. His wife did not call him at work to inform him that defendant had been taken to the police station. When Lopez arrived at his apartment, Villanueva was there. She told him that she had spoken to the police three or four times and they said that police officers would bring defendant home. At about 8 p.m., Villanueva called the police again. After that call, Lopez still did not know where his son was, so he went to a police station on Racine and another station on Damen looking for him. At the Racine station, Lopez asked officers to help him contact Detective Al Bautista, whose name was on the business card left with Garcia, but the officers refused to assist him. They also refused to help him locate his son. Lopez did not ask any officers at the Damen station to help him find Detective Bautista. He only asked if his son was there.

Lydia Villanueva testified that she lives near the Lopez family and knows them because her son is a friend of the defendant. On July 28,

2001, at about 2:30 p.m., defendant's sister, Hilda Lopez, went to Villanueva's house and told her that defendant had been taken to the police station. Villanueva went to the Lopez home and spoke with Garcia, who gave Villanueva a business card with Detective Bautista's name and telephone number on it. Villanueva started making calls. She first called the telephone number on the card at 3 p.m. Detective Bautista answered the call and Villanueva told him that defendant's mother was crying and nervous and wanted to know what was happening. Detective Bautista stated that he was going to ask defendant some questions and bring him back home, and that his mother did not need to worry. Villanueva called the number on the card a second time, at approximately 4 p.m., and spoke to Detective Bautista again. He stated that they were still questioning defendant, that they would bring him home, and that his mother should not worry. Villanueva did not ask where defendant was, and Detective Bautista did not volunteer that information. Villanueva called back between 5:30 and 6:30 p.m. and was told by the person who answered that Detective Bautista was on the street investigating. Villanueva was advised to call back in one hour. She called back at 8 p.m. and spoke to Detective Bautista for a third time. She told him that defendant's parents were very concerned. Detective Bautista reiterated that they were asking defendant questions and would have him home soon.

Villanueva testified that she never asked Detective Bautista to tell her where defendant was being questioned. Defendant's parents never requested that she ascertain that information. Villanueva also indicated that she never asked to speak with defendant or inquired as to whether defendant's parents could speak to him or join him at the police station. Detective Bautista did not volunteer any of that information either. Detective Bautista did question Villanueva at one point about her own son. The record does not provide information concerning the nature of that questioning. Telephone records admitted into evidence showed that five calls were made to the police station from defendant's home between 2:30 p.m. and 7:30 p.m.

Detective Alfonso Bautista testified that he and his partner, Detective Dennis Keane,[2] were assigned to investigate the murder of Hector Andrade. In the course of their investigation, they learned that defendant was a possible witness to the crime and went to his apartment at around noon on July 28, 1998, to speak with him. At that time, defendant was not considered a suspect.

Detective Bautista explained that he introduced himself and his partner, Detective Keane, to defendant's mother when she answered the door, speaking to her in Spanish. Detective Bautista asked Garcia if defendant lived there, and then asked if they could to speak to defendant. Garcia agreed and invited them into the kitchen area of her apartment. Once inside, Detective Bautista explained that defendant's name had been mentioned by other people in the course of a homicide investigation and he wanted to speak to defendant. Garcia left the kitchen area to call defendant. After a short while, she returned from the back of the apartment with defendant and a teenage girl, later identified as defendant's sister. Detective Bautista informed defendant that they were conducting a homicide investigation, that his name had been mentioned by other people they had talked to, and they "needed to–or wanted to ask him some questions." Detective Bautista also told defendant that he would prefer to conduct the questioning at the police station. He did not advise defendant that he had the option of being questioned in his home. Detective Bautista explained that it is his normal practice to interview witnesses at the police station when investigating a homicide; not on the street or in their homes. However, he admitted that two other witnesses to this crime were interviewed at their homes.

Defendant agreed to accompany the detectives to the police station. Detective Bautista then told defendant's mother that he wanted to ask defendant some questions, and asked "if it was okay with her if we went to the area rather than at the house to ask the questions." Detective Bautista also advised Garcia that they would be taking defendant to Harrison and Kedzie, and gave her his business

---

[2]Dennis Keane testified that he was promoted to sergeant. However, because he was a detective at the time relevant to this case, we will refer to him to as Detective Keane.

card. Defendant's sister asked if it was necessary for defendant's mother to accompany defendant to the police station. Detective Bautista advised Garcia that she could come to the police station if she so desired. Garcia did not indicate that she wanted to accompany her son. She stated that she would call later to check on defendant.

Detective Bautista testified that he and Detective Keane escorted defendant out of the apartment, but did not put their hands on him. On the way out, Detective Keane walked in front of defendant and Detective Bautista walked behind him. Defendant was not given *Miranda* warnings and was not handcuffed, and the detectives did not draw their guns. No other detectives were present at defendant's apartment. Defendant was driven in an unmarked car to the police station. The detectives did not offer defendant the opportunity to arrange his own transportation, and defendant did not state that he wanted to take alternate transportation.

At about 1 p.m., defendant was placed in an interview room at the police station. Defendant was not handcuffed and the door was not locked, but it was closed. The detectives questioned defendant for 15 to 20 minutes without giving him *Miranda* warnings. Detective Bautista did not arrange for a youth officer to be present because it is not "common practice" for a youth officer to be present when a juvenile witness is being questioned. During this questioning, defendant provided the name of a certain individual. The detectives advised defendant that they had to verify the information he provided and continue investigating. Before they left to do so, defendant was offered food. He was also advised that he should knock on the door if he needed anything. Detective Bautista explained that witnesses at the police station are generally not allowed to walk around freely. It is "procedure" for witnesses to be escorted by police personnel if they need to use the bathroom or any other services. According to Detective Bautista, the door to the interview room was closed when he left to investigate, but remained unlocked. Defendant was not handcuffed. At this time, it was Detective Bautista's belief that defendant was not arrested and was free to leave the station. However, defendant was never told that he was free to go and did not ask.

Detective Bautista and Detective Keane returned to the police station about two hours after they initially questioned defendant.

Detective Bautista did not check on defendant, but he believed Detective Keane looked in on him. Detective Bautista indicated that at some point in the afternoon, a female called the police station to inquire about defendant. The female asked if defendant was "okay" and Detective Bautista responded that defendant was fine, that they were still investigating, and that it would be a while because they had to speak to a lot of people. Detective Bautista stated that the female caller did not say that defendant's family wanted to come to the police station. Detective Bautista did not refuse to provide the caller with information regarding defendant's whereabouts. Detective Bautista was asked: "Did you ever tell them that you were just going to ask defendant some questions and then bring him home?" He replied: "I never said that."

Sometime before 6 p.m., Jose Leal was interviewed at the police station by Detectives Bautista and Keane and gave a statement implicating himself, defendant, and William Andrade in the murder. Leal was placed under arrest. At 6 p.m., the detectives reinterviewed defendant without providing *Miranda* warnings. Detective Bautista testified that, even after Leal's statement, he did not feel that it was necessary to give defendant *Miranda* warnings because they still considered him a witness. However, Detective Bautista admitted that defendant would have likely been restrained if he tried to leave the police station at that time. After being confronted with Leal's admission, defendant made an oral statement implicating himself in the crime. The detectives did not question defendant while he was giving the statement; defendant "just kept talking." Defendant was then given *Miranda* warnings and juvenile warnings, and the interview was terminated. Detective Bautista testified that defendant was advised that his parents would be contacted. Detective Bautista denied that he returned to defendant's house at that time, or any time after 12 p.m. that day.

Detective Keane's testimony was substantially the same as that of Detective Bautista. Detective Keane stated that they went to defendant's apartment on July 21, 1998, because they believed he was a "possible witness" to the crime. Defendant's mother responded to their knock on the door. Detective Bautista introduced himself and Detective Keane to Garcia and she allowed them into her home by leaving the door open and stepping aside. Detective Keane heard

Garcia call defendant's name and then walk into another room in the apartment. She emerged with defendant behind her. Detective Bautista spoke to defendant in English and explained that they were investigating a homicide and they wanted him to go to Harrison and Kedzie to talk. No one told defendant that they wanted to talk to him about gangs. Detective Keane stated that he never spoke to defendant in the apartment. He only spoke to defendant's sister, who was also present. Defendant agreed to go to the police station. Detective Keane did not tell defendant that he did not have to go or that he could find his own transportation, and defendant did not ask. Detective Keane did not ask defendant if he wanted someone to accompany him to the police station, and defendant did not indicate that he did not want to go alone.

Detective Bautista continued to talk to defendant's mother and handed her a business card. Detective Keane heard Detective Bautista say the words "Harrison and Kedzie," but he did not understand the rest of the conversation because it was in Spanish. When the conversation with defendant's mother was completed, Detective Keane walked out the door and down the stairs with defendant following him. Detective Bautista walked behind defendant. Defendant was not handcuffed and the detectives did not touch him. Detective Keane stated that he and Detective Bautista went to defendant's apartment alone, and he was not aware of any other officers being in the area. Detective Keane added that he did not return to defendant's apartment at any time that day.

After hearing this evidence, the trial court denied defendant's motion to quash arrest, finding that defendant voluntarily accompanied police officers to the station for questioning and was not seized until he was placed under arrest after the 6 p.m. statement. The trial court's discussion of the facts demonstrated that the court found the testimony of the police officers to be more credible than that of defendant and the witnesses he presented. The matter was continued for a hearing on defendant's motion to suppress his oral and handwritten statements. At that hearing, the parties stipulated to the evidence presented at the hearing on defendant's motion to quash arrest and presented the following additional evidence.

Detective Keane testified that he and his partner, Detective Bautista, went to defendant's apartment on July 21, 1998, after

learning that Jose Leal gave a written statement indicating that "Chucky," identified as William Andrade, and "Biggie," identified as defendant, told Leal that they were going to rob and kill the victim and that he would get some of the proceeds of their crime. Detective Keane and Detective Bautista brought defendant to the police station and told him about the information they had received from Leal. They did not share this information with defendant at his home or discuss it with his mother prior to bringing him to the police station. Detective Keane stated that they did not advise defendant of his *Miranda* rights when relaying this information to him because "[h]e was not a suspect in the homicide." Defendant denied that he was involved and directed the detectives to other people who had information about the crime. Detectives Keane and Bautista advised defendant that they were going to the area where the crime was committed to locate and interview other witnesses. Defendant "said it was fine. He would wait there." They left defendant in an interview room.

In the course of their continued investigation, the detectives reinterviewed Leal, and he admitted his own involvement in the crime. Leal also implicated defendant and "Chucky" again. Specifically, Leal stated that he was in the victim's apartment looking for money while defendant and "Chucky" "dealt" with Hector. Leal added that they all ran out of the apartment after "Chucky" stabbed Hector. Leal was arrested after making this statement.

At approximately 6 p.m., defendant was confronted with Leal's statement. Defendant was not given *Miranda* warnings. Detective Keane explained that he and Detective Bautista did not give defendant *Miranda* warnings because they were not sure of defendant's involvement in the crime. "Jose Leal had now given us 3 different statements about what happened, so we really weren't sure if Mariano *** had anything to do with anything at that point. We were still conducting our investigation, so we did not advise him of his rights because he was not under arrest at that time." Detective Keane reiterated later in his testimony that they did not feel they had probable cause to arrest defendant based on Leal's statement alone, and they had no other evidence of defendant's involvement when they spoke to defendant at 6 p.m. Detective Keane expressly denied withholding *Miranda* warnings in order to get a confession from

-11-

defendant. Specifically, defense counsel asked, "You didn't do that [arrest defendant] because you wanted to get information out of him before you felt that you had to advise him of his rights, didn't you?" Detective Keane responded, "No." Detective Keane explained that after obtaining Leal's confession, he and his partner "just went in and we told him [defendant]–we spoke to Leal, we talked to several other people and we asked him [defendant]–we wanted to know whether he was involved in this incident or not."

In a brief statement, defendant admitted that he was involved in the murder. According to Detective Keane, defendant stated, in summary, that he went into Hector's apartment, that Hector was bound up and stabbed, and that he left the apartment with "those two [Leal and Chucky]" and "proceeds." After defendant's admission, the detectives terminated the interview, read defendant his *Miranda* rights, and contacted defendant's parents and the State's Attorney's office. The assistant State's Attorney, Steven Fine, arrived sometime after 8 p.m. and began reviewing the case, but did not speak to defendant. Detectives Keane and Bautista likewise did not speak to defendant during that time.

Defendant's father arrived at the police station approximately 30 minutes after Fine. Detective Velez, who is Spanish-speaking, spoke to Lopez and directed him to the room where defendant was seated. Detective Keane explained that when defendant's father arrived he was allowed to speak privately with defendant. At approximately 9:15 p.m., defendant was interviewed by Assistant State's Attorney Fine and was given *Miranda* warnings. Defendant's father was present for the interview, and Detective Velez served as his translator. Detective Keane was also in the room.

Detective Keane stated that Fine introduced himself to defendant and gave him *Miranda* warnings. Defendant agreed to waive those rights and speak with Fine. Fine spoke to defendant in English, and the entire conversation with Fine was translated in Spanish for defendant's father. The process was lengthy because Fine had to pause after every sentence for Detective Velez to repeat the comments in Spanish for defendant's father. After Fine wrote down defendant's

statement,[3] it was reviewed by defendant and his father. Defendant demonstrated that he could read English by reading a portion of the statement aloud. Changes made to the document were initialed by everyone in the room. Detective Keane noted that Fine had spelled defendant's name incorrectly throughout the document, so there were several corrections that were initialed by all the parties present, including defendant's father. Detective Keane denied telling defendant that he would be free to leave the police station after he signed the statement.

Detective Keane was asked why a youth officer was not notified in this case. He explained:

> "Well, up until the point where he implicated himself, we were just interviewing him. We needed facts and we were trying to talk to him about what he knew or what he didn't know. And he was providing some facts to us. And once he implicated himself, it was terminated and we felt that the parent would have been the best first person to have in that room with him."

Detective Carlos Velez testified that he was contacted by Detective Keane on July 21, 1998, at approximately 8:30 p.m., and asked to translate for defendant's parent. Detective Velez went to the interview room and met with Detective Keane, defendant, defendant's father, and Fine. Detective Velez spoke to Lopez, who stated that he could understand English, but preferred to speak in Spanish. Detective Velez translated for Lopez while defendant was advised of his rights. Lopez did not ask any questions regarding those rights. Detective Velez translated defendant's handwritten statement, which was read aloud by Fine, and translated while defendant made changes to the document. Detective Velez signed the document, as did all the other parties who were present, including defendant's father. Detective Velez did not hear Detective Keane tell defendant he could leave if he signed the statement.

Defendant testified, as he had previously, that he was placed in an interview room when he was brought to the police station. The door to the room was locked with a slide lock that was located on the

---

[3]Defendant's handwritten statement was not included in the record.

outside of the door. Defendant stated that he tried to get out of the room but was unable to do so because he was locked in. Defendant initially testified that he was allowed to use the bathroom while at the police station. He later stated that he was not allowed to use the bathroom.

Defendant was asked if he knew what a State's Attorney was, and he replied that he did not. He likewise did not know what a State's Attorney was when his statement was taken. The State's Attorney advised defendant of his rights, but defendant did not understand them. He had never been advised of his rights before that time. He did not tell the State's Attorney that he did not understand.

Defendant testified that his father was not in the room when his handwritten statement was taken. There was a man writing things down and two detectives. The detectives asked defendant questions and he answered them. He did this because the detectives told him he was not leaving the room until he said something, and he believed he could go home if he answered the questions. Defendant stated that he lied to the man writing the statement because he wanted to go home. Defendant indicated that the man writing the statement only read certain sections to him and defendant never reviewed the statement himself. He did admit, however, that he was allowed to make any changes to the statement that he felt were necessary and that he did, in fact, make changes and initial them.

Defendant testified that he did not see his father prior to signing the statement and his father was not present when the statement was signed. Ten minutes after defendant signed the paper, his father came into the room. A police officer gave the paper to defendant's father and directed him to sign it. Defendant could not recall which police officer gave the paper to his father.

Defendant's father testified, as he had previously, that he went to two police stations to find his son on July 28, 1998. When he returned home, his daughter told him that police were coming to the apartment to look for evidence related to a burglary. The police came and searched, but did not find anything. Lopez was taken to the police station by officers who searched his apartment. When he got there, he was immediately taken to a room. He was given papers to sign "right away." He signed them because he believed that they were papers authorizing defendant's release. Lopez explained that he believed

defendant was going to be released because the police found no evidence related to a burglary in his apartment. He never had an opportunity to speak to his son privately and was never advised that his son was being charged with murder. He did not review the papers before he signed them and no one read or explained them to him. Further, no one spoke to him in Spanish. Lopez testified that he was not present when the documents were prepared. He did not see anyone ask defendant questions and then write out the answers. Defendant was present in the room when Lopez signed the documents. Two police officers were present as well, one of whom had searched Lopez's apartment and drove Lopez to the police station. One of the men told Lopez to sign the document and showed him where to initial.

In rebuttal, Fine testified that he went to the police station on July 21, 1998, sometime after 7 p.m. He waited for defendant's father to arrive before speaking to defendant. After defendant's father arrived, Fine went into the interview room with Lopez, Detective Keane, and Detective Velez, who acted as Lopez's interpreter. Fine testified that he advised defendant of his *Miranda* rights. Defendant stated that he understood them and did not ask any questions. Defendant agreed to speak with Fine and made an oral statement. After the oral statement, Fine told defendant that he wanted to memorialize the statement and explained that the statement could be taken by a court reporter, videotaped, or handwritten by Fine. Defendant chose to give a handwritten statement. Defendant's father was present while the handwritten statement was taken. When the statement was completed, defendant read the preprinted portion of the form aloud to demonstrate his competence in English. Fine then read the entire handwritten portion of the statement aloud. Detective Velez interpreted for Lopez while Fine read. Corrections were made to the statement and initialed by everyone present. When the statement was complete, all the parties signed the statement, including Lopez.

After hearing this evidence, the trial court granted defendant's motion to suppress with respect to the 6 p.m. oral statement made after defendant was confronted with Leal's admission. The court found that the detectives had probable cause to arrest defendant after obtaining Leal's confession and should have advised defendant of his rights and called his parents before questioning him.

-15-

With respect to defendant's handwritten statement, the court found that the testimony of defendant and his father was incredible and that the statement was voluntarily given. The court also concluded that there was attenuation between the oral and written statements. The court made this determination without conducting an attenuation hearing, finding that there was sufficient evidence presented at the suppression hearing to make this judgment. The trial court denied defendant's motion to suppress the handwritten statement. Defendant's motions to reconsider the court's rulings were denied.

The matter proceeded to a bench trial. The parties stipulated to testimony taken at Leal's trial from Officer Tamara Block, Officer Daniel Principato, a forensic investigator, and Cynthia Engleking-Prus, a forensic scientist. Officer Block testified that she was the first officer to enter the victim's apartment and observe the murder scene. She noticed that the apartment smelled of gas, which seemed to be emanating from the stove. Upon entering the living room, she saw that the victim was lying on his stomach in a pool of blood with his hands, feet, and head bound with duct tape. He had been stabbed multiple times. Officer Principato testified that he inventoried certain evidence, including four Corona beer bottles, taken from the scene. Cynthia Engleking-Prus testified that Leal's fingerprint was found on a Corona beer bottle inventoried at the crime scene, and William Andrade's fingerprint was found on duct tape removed from the victim's body.

The main evidence presented by the State against defendant was defendant's handwritten statement. In that statement, defendant stated that he was 15 years old, was in his third year of high school, and could read and write English. Defendant then explained that he saw his friend, Leal, at the St. Paul's Catholic Church festival on July 12, 1998. Leal asked defendant if he wanted to rob a man with whom Leal worked who was "flashing money" at the festival. Leal cautioned that they would have to kill the man after they robbed him because the man knew Leal. The following day, defendant saw Leal and "Chucky" (William Andrade) and Leal asked defendant again if he wanted to be a part of the robbery. Leal then took defendant and Chucky to the victim's apartment. The group waited until it was dark and then knocked on the victim's door. The victim answered and Leal

asked him if he could borrow two movies. Leal then pushed the door open and walked in with defendant and Chucky following. Leal and Chucky grabbed the victim and Leal duct taped his hands and ankles while Chucky held him down. The victim was lying on his stomach. Leal eventually went into the kitchen, got a knife, and stabbed the victim "sideways" until he stopped moving.

While the stabbing occurred, defendant looked for money and found the victim's wallet. Leal also looked for items to steal and found some jewelry, which he put in his pocket. Chucky took a camera. Defendant found some stereo equipment and carried it toward the door. Defendant left the stereo equipment in the apartment because individuals in another apartment were "banging" and complaining about the noise. Before they left the apartment, Leal turned the gas on the stove but there was no flame. Defendant, Leal, and Chucky ran out of the apartment. When they were a few blocks away, defendant gave the wallet to Leal and ran home. A few days later, Leal called defendant and invited him to a movie. Leal stated he would treat because he had $200.

Defendant was found guilty and was sentenced to a total of 23 years in prison. On appeal, defendant asserted that the trial court erred in denying his motion to quash arrest because he was unlawfully seized from his apartment without probable cause in violation of the fourth amendment. The appellate court rejected this claim, finding that defendant voluntarily accompanied the police for questioning. 367 Ill. App. 3d at 822-23. Defendant also asserted that his statement should have been suppressed because the police violated his fifth amendment rights when they engaged in an unlawful "question first, warn later" interrogation technique. The appellate court rejected this claim as well, finding that there was no evidence that the detectives intentionally withheld *Miranda* warnings in order to secure a confession from defendant. 367 Ill. App. 3d at 825. Defendant now appeals the appellate court's judgment.


ANALYSIS

Defendant calls upon this court to review the judgments of the lower courts with respect to his motions to quash arrest and suppress his handwritten statement. Defendant, however, has failed to include

-17-

these motions in the record before us on appeal in contravention of Supreme Court Rule 321 (155 Ill. 2d R. 321). We note that the appellant bears the burden of providing a reviewing court with a complete record sufficient to support his claims of error, and any doubts that arise from the incompleteness of the record will be resolved against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

Defendant asserts that the appellate court ignored its own well-established precedent when it affirmed the trial court's denial of defendant's motion to quash arrest. In support, defendant points to *People v. Vega*, 203 Ill. App. 3d 33 (1990), *People v. Armstrong*, 318 Ill. App. 3d 607 (2000), and *In re J.W.*, 274 Ill. App. 3d 951 (1995). Defendant maintains that the same facts that guided the appellate court's judgment in those cases are present here, and argues that the facts of the instant case are even more compelling. The State counters that the evidence in this case shows that defendant voluntarily accompanied the officers to the police station and that none of the procedures normally associated with an arrest were present. The State also contends that the cases cited by defendant in support of his position are readily distinguishable. Neither party asserts that the police had probable cause to arrest defendant at his apartment.

When reviewing a motion to suppress evidence, we defer to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 196-97 (2006). In this case, the trial court found that the defense witnesses did not present credible testimony. The appellate court upheld this decision, finding that it was not against the manifest weight of the evidence. 367 Ill. App. 3d at 823.

Defendant does not ask this court to review the trial court's factual findings for manifest error. In fact, at oral argument, defendant specifically stated that no credibility contest existed in this case. Defendant made clear that he accepted the appellate court's conclusion that the trial court's credibility assessments were not manifestly erroneous. Accordingly, we review defendant's claims of error with deference to the fact determinations of the trial court.

The first question before this court is a legal one–whether defendant was unlawfully seized under the fourth amendment. We

review this issue *de novo*. *Sutherland*, 223 Ill. 2d at 197; *Sorenson*, 196 Ill. 2d at 431.

The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect citizens from unreasonable searches and seizures by the government. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §6; *People v. Lee*, 214 Ill. 2d 476, 484 (2005). Seizure occurs when, by means of physical force or a show of authority, a person's freedom of movement is restrained. *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980); *People v. Bunch*, 207 Ill. 2d 7, 18 (2003). For purposes of the fourth amendment, a seizure is an arrest. *People v. Melock*, 149 Ill. 2d 423, 436 (1992).

"An arrest occurs when the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave." *In re D.G.*, 144 Ill. 2d 404, 409 (1991). When assessing whether a juvenile was seized for purposes of the fourth amendment, we modify the reasonable person standard to consider whether a reasonable juvenile would have thought that his freedom of movement was restricted. *People v. Braggs*, 209 Ill. 2d 492, 509-11 (2004). In *Melock*, we considered several factors when determining whether a reasonable person would not have felt free to leave, such as: the intent of the officer; the understanding of the defendant; whether the defendant was told he was free to leave or that he was under arrest; whether the defendant would have been restrained if he attempted to leave; the length of the interrogation; and whether *Miranda* warnings were given. *Melock*, 149 Ill. 2d at 437-39. Additionally, courts have considered the number of police officers who sought the defendant; whether the defendant was told he could refuse to accompany the police; whether the defendant was transported to the station in a police car or arranged his own transportation; whether the defendant was placed in an interview room as opposed to a common area; and the method of interrogation. *Armstrong*, 318 Ill. App. 3d at 613; *People v. Williams*, 303 Ill. App. 3d 33, 40 (1999); *J.W.*, 274 Ill. App. 3d at 960; *Vega*, 203 Ill. App. 3d at 41-42. When the defendant is a juvenile, courts have also considered the defendant's experience with the criminal justice system and his educational background. *Armstrong*, 318 Ill. App. 3d at 615; *Vega*, 203 Ill. App. 3d at 43.

With these factors in mind, we now consider whether a reasonable juvenile, in defendant's situation, would have believed that he was compelled to accompany detectives to the police station for questioning and whether he would not have felt free to leave once there. The facts show that defendant was 15 years old with no criminal record when two detectives came to his apartment and asked him to accompany them to the police station for questioning in regard to a murder investigation. Defendant's mother was present and did not protest when defendant agreed to go. The detectives gave defendant's mother a contact number and told her that she could accompany her son to the police station if she chose, but her presence was unnecessary. Defendant left his apartment on his own accord and there was no physical coercion by the detectives. Defendant was not handcuffed, and no guns were drawn. Defendant was escorted to an unmarked police car and sat in the backseat unrestrained. Defendant was not advised that he could decline the detectives' request to accompany them to the station and was not advised that he could arrange his own transportation.

When defendant arrived at the police station, he was placed in an unlocked interrogation room and was questioned for a short time without receiving *Miranda* warnings. Defendant was advised that he was implicated in a murder. Defendant denied involvement and gave the detectives information related to the crime. He was then left alone in the interrogation room so detectives could investigate the information he had provided to them. Defendant was not told that he was free to leave the police station. He was not advised that he could move about the police station without an escort. Instead, he was kept in the interrogation room with the door shut and told to knock on the door if he needed anything. Defendant believed the door to the room was locked, even though the detectives denied locking it. Defendant remained in the interrogation room alone for at least four hours before the detectives returned. During that four-hour period, defendant did not speak to his parents. There is no indication in the record that defendant asked to see or talk to his parents. However, the record demonstrates that a representative of defendant's family was calling the police station during that time to inquire about defendant's status. When the detectives returned, they confronted defendant with Leal's

-20-

statements, which implicated defendant in the crime, and the confrontation prompted defendant to confess.

Defendant maintains that, in light of these facts and the appellate court's decisions in *Vega*, *Armstrong*, and *J.W.*, we should conclude that he was unlawfully seized. In *Vega*, police went to the 16-year-old defendant's home and transported him to the police station for questioning. The defendant's mother was present in the home and although she consented to the defendant's accompanying the officers, she questioned why the officers could not speak to the defendant at home. The defendant was not advised that he could refuse to accompany the detectives or arrange his own transportation to the police station. It was uncontested that the police held the defendant by the arm when they escorted him to the police vehicle. When he arrived at the station, the defendant was placed in an interrogation room, questioned, and left alone while detectives investigated further based on information he provided. The detectives testified that they did not believe the defendant's answers to their questions, and further testified that the defendant would have likely been restrained if he tried to leave. The defendant was also pressured to take a polygraph test and was transported to the crime laboratory for testing without his consent. *Vega*, 203 Ill. App. 3d at 42-43. The appellate court concluded that these factors, combined with defendant's age and absence of extensive experience with the criminal justice system, demonstrated that defendant was unlawfully seized when he was taken from his home. *Vega*, 203 Ill. App. 3d at 43.

In *Armstrong*, police received numerous anonymous calls stating that the defendant was involved in the beating and burning death of the victim. A juvenile officer went to the defendant's home and asked the defendant's guardian if the defendant could accompany her to the police station. The officer told the defendant's guardian that she needed to talk to the defendant, that she would bring him to the station and bring him right back, and if anything else occurred, that she would contact the guardian. The defendant was allowed to accompany the juvenile officer to the police station because the juvenile officer was known and trusted by the defendant's guardian. In fact, the guardian stated that it would be "no problem" for defendant to go to the police station as long as he was with the juvenile officer. At the police station, the defendant was brought to

an open lounge, given *Miranda* warnings, and questioned. He admitted involvement in the crime. *Armstrong*, 318 Ill. App. 3d at 610-11. At the time, the defendant was in the ninth grade, was receiving special education, and had not been previously arrested. The appellate court noted that the defendant was the focus of the murder investigation based on anonymous tips. This fact, combined with the defendant's age, lack of previous arrests, educational level, and lack of any communication that he was free to leave, led the appellate court to conclude that the defendant was unlawfully seized. *Armstrong*, 318 Ill. App. 3d at 615.

Finally, in *J.W.*, three police officers went to the 14-year-old defendant's school, where the defendant was in the eighth grade, to question him about a murder. The defendant was called to the principal's office, asked to accompany the officers to the police station, and was only allowed to obtain his belongings with a police escort. The police took the defendant out of school without contacting his mother; they contacted his grandmother who was not his guardian. The defendant rode to the police station in the back of a police car with no door handles and was never told that he did not have to go with the officers or that he was not under arrest. *J.W.*, 274 Ill. App. 3d at 958-60. When the defendant arrived at the police station, he was escorted to an interview room. The door to the interview room was open. The defendant was questioned by four police officers and was confronted with information placing him at the crime scene. When the defendant denied involvement, he was not told he was free to leave. The appellate court noted that the defendant would have been hard-pressed to leave in any event, as he was a 14-year-old with no means of transportation available that would allow him to leave the police station on his own accord. The appellate court concluded that the number of officers present, information known to the officers, method of interrogation, place of questioning and lack of communication that the defendant was free to leave demonstrated that the defendant was unlawfully seized. *J.W.*, 274 Ill. App. 3d at 961.

While many of the facts present in *Vega*, *Armstrong*, and *J.W.* are present in the instant case, the instant case is still factually distinguishable. In *Vega*, it was uncontested that the defendant's mother specifically asked the officers to question the defendant at home. Further, the officers physically coerced the defendant by taking

-22-

him by the arm and escorting him out of his home. *Vega*, 203 Ill. App. 3d at 34-35. In *Armstrong*, the facts show that the defendant was the target of the officer's investigation, that the officer misled the defendant and his guardian about the nature of the questioning, and that the defendant was allowed to go with the officer because she was known to defendant's guardian. *Armstrong*, 318 Ill. App. 3d at 610. Finally, in *J.W.*, the defendant was removed from school by three police officers without his mother's knowledge or consent and not allowed to even retrieve his belongings without a police escort. *J.W.*, 274 Ill. App. 3d at 954-55.

Here, defendant was asked, in the presence of his mother and adult sister, to accompany the detectives to the police station for questioning. Both defendant and his mother agreed that he would go. Defendant was not handcuffed, and the evidence deemed credible by the trial court demonstrated that the detectives did not make any threat or show of force which would have led defendant to believe that he was required to accompany them. We acknowledge that defendant was 15-years-old at the time and had no experience with the criminal justice system. However, the facts are clear that defendant's mother was present for defendant's entire at-home interaction with the detectives and she did not object to defendant's accompanying them to the police station (see *People v. Sneed*, 274 Ill App. 3d 287, 297 (1995) (appellate court considered fact that defendant was asked, and agreed to go to station, with grandmother present as evidence that the defendant voluntarily accompanied the police)), even when fully advised that the detectives wanted to speak to defendant about a murder. The evidence deemed credible by the trial court demonstrated that defendant was not considered a suspect at the time and was not the target of the detective's investigation. There is no indication that the detectives did anything that would suggest that defendant was compelled to accompany them or that the detectives mislead defendant or his mother about the purpose of their interaction with defendant.

The facts of this case are more like those in *People v. McKinney*, 277 Ill. App. 3d 889 (1996). In that case, two detectives went to the 17-year-old defendant's home to question her about the death of her baby. The defendant's mother was present when the detectives arrived. After a brief discussion at the defendant's home, the

detectives asked the defendant to accompany them to the police station, and defendant agreed. The defendant and her mother were driven to the station in a police car. The defendant was never advised that she did not have to accompany the officers and was never told that she could arrange her own transportation. The defendant maintained that she was told to accompany the detectives in a forceful tone, although this allegation was rebutted. The defendant cited to *Vega* in support of her assertion that a reasonable person in her position would not have felt free to decline the officers' request. The appellate court disagreed, finding no evidence that the detectives' behavior compelled the defendant to accompany them. The appellate court also noted that it was unlikely that the detectives went to the defendant's home with the intention of arresting her, as the cause of her baby's death was still unknown. The appellate court found that a reasonable juvenile in the defendant's situation would have felt free to decline the detectives' request.

We reach the same conclusion here. Like the juvenile defendant in *McKinney*, defendant was initially approached by the police in the presence of his mother. Defendant agreed to accompany the police and his mother did not protest. At the time defendant made this decision, he was aware that his presence at the police station was required because of the criminal investigation. Further, the evidence suggests that defendant's decision to accompany the police was voluntary and not the result of coercion.

Our analysis does not end there, however, because defendant's initial, voluntary presence at the police station does not negate the possibility that subsequent police conduct was unlawful. See *McKinney*, 277 Ill. App. 3d at 894; *People v. Barlow*, 273 Ill. App. 3d 943, 949 (1995). In this case, the facts demonstrate that defendant arrived at the police station at 1 p.m. and was immediately placed in an interview room for questioning. He was interviewed by two detectives for approximately 20 minutes and was advised during the interview that he had been implicated in the crime. Defendant then provided information about the crime and was told to wait in the interview room while the detectives conducted further investigation. Defendant was not taken out of the interview room and escorted to an open area. He was not permitted to walk around the police station without an escort. Instead, he was left in an interview room with the

door shut and told to knock if he needed to use the restroom or required other assistance. The detectives testified the room was unlocked, but defendant believed that he was locked in. Defendant was not advised that he was free to leave even though the detectives testified that defendant would have been permitted to leave at this point if he desired. Defendant remained in the interview room for four hours without contact with his family or any other person interested in his well-being. Defendant's family was calling repeatedly to obtain information about defendant's status, but they were never advised that he was free to leave; only that he was being questioned.

Although defendant did not receive *Miranda* warnings, and no other indicia of formal arrest were present, we cannot conclude that a reasonable juvenile in defendant's position would have felt free to leave the police station. Defendant's voluntary presence at the police station escalated into an involuntary seizure in violation of defendant's fourth amendment rights. See *McKinney*, 277 Ill. App. 3d at 894; *People v. Wallace*, 299 Ill. App. 3d 9, 17-18 (1998); *Barlow*, 273 Ill. App. 3d at 950. We recognize that the investigatory function of the police necessitates station-house questioning. See *People v. Wipfler*, 68 Ill. 2d 158, 168 (1977). However, we reject "the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." *Barlow*, 273 Ill. App. 3d at 950; see also *People v. Reynolds*, 257 Ill. App. 3d 792, 801 (1994); *People v. Walls*, 220 Ill. App. 3d 564, 579 (1991); *People v. Stofer*, 180 Ill. App. 3d 158, 166-68 (1989). This is particularly true when the person in question is a minor.

Our determination that defendant was illegally seized at the police station does not end our analysis. We must now consider whether the handwritten statement, taken after the illegal seizure, was admissible. The State asserts that we should consider whether there was sufficient attenuation between defendant's unlawful arrest and handwritten statement to render that statement admissible. The State includes a caveat, however, arguing that we should only make this consideration if the outcome favors the State. If the outcome will favor defendant, the State urges us to remand the matter for an attenuation hearing. Defendant likewise asserts that, if this court were to reach the issue

of attenuation, the matter should be remanded for an attenuation hearing because no such hearing was conducted below. However, defendant urges this court to first consider whether his handwritten statement should have been suppressed because it was involuntary under the fifth amendment.

We are presented with two distinct considerations: first, whether defendant's handwritten statement was voluntary under the fifth amendment protection against self-incrimination, such that defendant understood the *Miranda* warnings and felt that he had a legitimate choice to exercise them, and, second, whether, for fourth amendment purposes, the handwritten statement was sufficiently attenuated to purge the taint of defendant's illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 601-02, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2260-61 (1975). As the Supreme Court explained in *Dunaway v. New York*, the fifth amendment voluntariness requirement is a " 'threshold requirement' " for fourth amendment analysis. *Dunaway*, 442 U.S. 200, 217, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259 (1979), quoting *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262. The fact that an illegally seized defendant ultimately received *Miranda* warnings, waived them, and voluntarily spoke to police does not automatically mean that the causal connection between the illegality and the arrest has been broken for fourth amendment purposes. *Dunaway*, 442 U.S. at 217-18, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259. However, as the United States Supreme Court instructed in *Dunaway*, "if the *Fifth Amendment* has been violated, the *Fourth Amendment* issue would not have to be reached." (Emphasis added.) *Dunaway*, 442 U.S. at 217, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259. Accordingly, we first consider defendant's fifth amendment claim that his handwritten statement was involuntary.

Defendant relies on the Supreme Court's opinion in *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004) (plurality op.), to support his fifth amendment contention. The State counters that defendant misapplies *Seibert* and that suppression of his statement is unwarranted based on the facts of this case. We conclude that defendant's statement was involuntary and should be suppressed.

The fifth amendment protects against involuntary self-incrimination. *People v. Willis*, 215 Ill. 2d 517, 519 (2005). In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602

(1966), the United States Supreme Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Seibert*, 542 U.S. at 608, 159 L. Ed. 2d at 653, 124 S. Ct. at 2608 (plurality op.). *Miranda* forged a bright-line rule (*People v. Jones*, 219 Ill. 2d 1, 27 (2006)); however, the rule is not without exception.

In *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), the Supreme Court recognized that suppression of all statements obtained after police failed to warn pursuant to *Miranda* was not always necessary. In that case, police went to the defendant's house with a warrant for his arrest. As defendant was being escorted out, one officer stopped to explain the arrest to his mother. The other officer sat down with the defendant in the living room and asked the defendant questions without advising him of his *Miranda* rights. The defendant made an incriminating statement. *Elstad*, 470 U.S. at 300-01, 84 L. Ed. 2d at 227, 105 S. Ct. at 1288-89. Later, at the police station, defendant was given *Miranda* warnings, waived them, and made a statement. At trial, defendant's prewarning statement was suppressed. The Supreme Court considered whether the postwarning statement should also have been suppressed, and explained: "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question." *Elstad*, 470 U.S. at 312, 84 L. Ed. 2d at 234, 105 S. Ct. at 1295. The *Elstad* Court then concluded:

> "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent

-27-

choice whether to waive or invoke his rights." *Elstad*, 470 U.S. at 314, 84 L. Ed. 2d at 235, 105 S. Ct. at 1296.

The Supreme Court revisited *Elstad* in *Seibert*. There, the defendant was arrested for murder and interrogated by police without receiving *Miranda* warnings. After the defendant made an incriminating statement, the police gave her a 20-minute break, turned on a tape recorder, gave her *Miranda* warnings, and obtained a signed waiver of her *Miranda* rights. The interrogating police officer then went on to question the defendant using information the defendant had supplied prior to receiving *Miranda* warnings. *Seibert*, 542 U.S. at 605, 159 L. Ed. 2d at 650-51, 124 S. Ct. at 2606 (plurality op.). The defendant filed motions to suppress both her prewarning and postwarning statements. At the suppression hearing, the interrogating police officer testified that "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " *Seibert*, 542 U.S. at 605-06, 159 L. Ed. 2d at 651, 124 S. Ct. at 2606 (plurality op.).

In a plurality opinion authored by Justice Souter, the Supreme Court stated that the question first, warn later technique utilized by the officer rendered the resulting statement inadmissible. *Seibert*, 542 U.S. at 617, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613 (plurality op.). In reaching this conclusion, the plurality declined to apply *Elstad*'s test to determine, first, whether the initial, prewarning statement was made without coercion, and then, whether the subsequent statement was given after a knowing waiver of the defendant's rights. *Seibert*, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612 (plurality op.). Instead, the plurality limited *Elstad* to its facts, and concluded that it applied where the police officers' failure to warn amounted to "a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612 (plurality op.).

The plurality then created a new test to determine whether warnings delivered after questioning could be effective enough to protect a suspect's rights. The test required consideration of "the completeness and detail of the questions and answers in the first

round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612 (plurality op.). Applying this test to the facts before it, the plurality determined that the statements made by the defendant were obtained through a police strategy designed to undermine *Miranda* and were thus inadmissible. *Seibert*, 542 U.S. at 616, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612 (plurality op.).

Justice Kennedy wrote a concurrence agreeing with the plurality's overall decision that the two-step interrogation technique utilized by the officer was improper. However, Justice Kennedy concluded that the test fashioned by the plurality, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations[,] *** cuts too broadly." *Seibert*, 542 U.S. at 621-22, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Justice Kennedy proposed a "narrower test applicable only in the infrequent case *** in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Under Justice Kennedy's test, the principles of *Elstad* would govern admission of statements made without the benefit of *Miranda* warnings unless the evidence demonstrated that police officers deliberately employed a question first, warn later interrogation strategy. If that strategy was deliberately used, statements taken after *Miranda* warnings would be excluded unless "curative measures were taken," such as a substantial break in time and circumstances between the statements, that would allow the accused "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring).

The Supreme Court has instructed: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States*, 430

U.S. 188, 193, 51 L. Ed. 2d 260, 266, 97 S. Ct. 990, 993 (1977), quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 49 L. Ed. 2d 859, 872 n.15, 96 S. Ct. 2909, 2923 n.15 (1976). Most federal circuits, including the Seventh Circuit, have interpreted *Seibert* in accordance with Justice Kennedy's concurrence. *United States v. Carter*, 489 F. 3d 528, 535-36 (2d Cir. 2007); *United States v. Naranjo*, 426 F.3d 221, 231-32 (3d Cir. 2005); *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004); *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006); *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006); but see *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006); see also *United States v. Capers*, No. 06 Cr. 266 (S.D.N.Y. March 29, 2007).

As the Seventh Circuit explained:

> "What emerges from the split opinions in *Seibert* is this: at least as to *deliberate* two-step interrogations in which *Miranda* warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of *Elstad* has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second. \*\*\* Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*." (Emphasis in original.) *Stewart*, 388 F.3d at 1090.

This court has not previously been asked to apply *Seibert* and, therefore, has not taken a position on which portion of the opinion is controlling. However, after considering the analyses of the federal circuit courts, along with the instruction provided by the Supreme Court in *Marks*, we find that Justice Kennedy's concurrence resolves the case on the narrowest grounds and is therefore controlling authority. We note that our appellate court has recently adopted this interpretation of *Seibert* in *People v. Montgomery*, 375 Ill. App. 3d 1120 (2007), and *People v. Loewenstein*, 378 Ill. App. 3d 984 (2008); see also *People v. Degorski*, No. 1–07–2784 (March 31, 2008) (distinguishing *Seibert* on the grounds that the officers in *Degorski* did not intentionally use the question first, warn later interrogation

technique); but see *Martinez v. State*, 204 S.W.3d 914 (Tex. App. 2006).

In applying Justice Kennedy's concurrence, we must first determine whether the detectives deliberately used a question first, warn later technique when interrogating defendant. If there is no evidence to support a finding of deliberateness on the part of the detectives, our *Seibert* analysis ends. If there is evidence to support a finding of deliberateness, then we must consider whether curative measures were taken, such as a substantial break in time and circumstances between the statements, such that the defendant would be able "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring).

We acknowledge, as did the *Seibert* plurality, that police officers will generally not admit on the record that they deliberately withheld *Miranda* warnings from a suspect in order to obtain a confession. *Seibert*, 542 U.S. at 616 n.6, 159 L. Ed. 2d at 657 n.6, 124 S. Ct. at 2612 n.6 (plurality op.). In *Montgomery*, our appellate court made the same observation and found guidance in the Ninth Circuit's opinion in *Williams*, 435 F.3d at 1158-59. *Montgomery*, 375 Ill. App. 3d at 1127. We also find *Williams* to be instructive.

The *Williams* opinion provides an analytical framework for determining whether deliberate misconduct occurred during an interrogation without direct evidence. This framework encompasses the considerations made by Justice Kennedy, as well as the *Seibert* plurality. The *Williams* court instructs: "[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Williams*, 435 F.3d at 1158. The *Williams* court considered the following factors, originally set forth by the *Seibert* plurality to determine the admissibility of a postwarning statement, as guidelines for assessing evidence objectively: "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Williams*, 435 F.3d at 1159, citing *Seibert*, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612 (plurality op.).

Within this framework, we look to the objective evidence in this case. The 15-year-old defendant was brought to the police station at approximately 1 p.m. and placed in an interrogation room. Detectives questioned him at that time and advised him that Leal had implicated him in Hector's murder. Defendant provided the detectives with information and was left alone in the same room, with the door closed, for four to five hours while detectives continued to investigate. Defendant was not handcuffed during this period and the door to the interview room remained unlocked. However, defendant's freedom of movement was restricted, as he was not allowed to leave the room without an escort and was never told that he was free to leave the police station.

At 6 p.m., the detectives who initially brought defendant to the station, questioned him, and left him in the interview room returned to that same interview room and spoke to defendant again. They told defendant that Leal had admitted to participating in Hector's murder and that Leal had implicated him. At this time, defendant was aware that Leal had now implicated him twice in this crime, and that Leal had confessed. Without providing *Miranda* warnings, the detectives asked defendant "whether he was involved in this incident or not." Defendant answered by giving an incriminating oral statement. Detective Bautista testified that defendant was not questioned while he gave the statement, he "just kept talking." After defendant confessed, the detectives stopped questioning him, gave him his *Miranda* warnings, and terminated the interview.

Looking at the subjective evidence, we note that Detective Keane explicitly denied using the "question first, warn later" technique when asked directly by defense counsel. Detective Keane explained that he and Detective Bautista did not give defendant *Miranda* warnings before confronting him with Leal's evening statement because, despite Leal's incriminating admission and implication of defendant, they were still not certain that defendant had a role in the commission of the crime and did not consider him a suspect. Nevertheless, Detective Keane testified that defendant would likely not have been free to leave the police station at that point if he attempted to do so.

The objective and subjective evidence available to this court, when viewed in its totality, supports an inference that the detectives engaged in some form of the "question first, warn later" interrogation

technique when they confronted defendant at 6 p.m. with Leal's statement and obtained defendant's oral confession. The uncontested facts demonstrate that Leal was taken into custody after implicating defendant and confessing to his own part in the crime. If Leal's statement was sufficient to elevate his status from that of a witness to a suspect, we presume it had the same effect on defendant's status. We acknowledge that Detective Keane testified otherwise, stating that defendant was still considered a witness after Leal's incriminating statement. We also acknowledge that the trial court found Detective Keane's testimony to be credible overall, and defendant does not challenge the trial court's credibility assessment as being against the manifest weight of the evidence.

However, the record demonstrates a contradiction in Detective Keane's testimony which the trial court did not specifically address and we cannot ignore. Although Detective Keane claimed that defendant was not a suspect, he nevertheless testified that defendant would not have been free to leave the police station at 6 p.m. after Leal's incriminating statement had been obtained. In light of these facts, we can think of no legitimate reason why the detectives failed to give defendant his *Miranda* warnings prior to the 6 p.m. confrontation, other than a deliberate decision to circumvent *Miranda* in hopes of obtaining a confession, which would ultimately lead to a handwritten statement.

In his concurrence in *Seibert*, Justice Kennedy discussed situations where an officer might mistakenly withhold *Miranda* warnings, and pointed out that mistakes of this sort could not be considered deliberate. "An officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time." *Seibert*, 542 U.S. at 620, 159 L. Ed. 2d at 660, 124 S. Ct. at 2615 (Kennedy, J., concurring). We do not believe that the detectives in this case made such a mistake. The detectives were clearly interrogating defendant, as they confronted him with Leal's statement and pointedly asked him if he was involved in the crime. Moreover, it was plain that defendant was in custody, as Detective Keane testified that defendant would not have been free to leave the police station at that time. We find that the objective and subjective

evidence present in the record supports an inference that detectives deliberately withheld *Miranda* warnings from defendant.

Having reached this conclusion, we must now consider whether defendant's handwritten statement is nevertheless admissible. The relevant question is whether, after receiving midstream *Miranda* warnings, a reasonable person, in defendant's situation, would have understood that he retained a choice about continuing to talk to police. *Seibert*, 542 U.S. at 617, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613 (plurality op.); *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). On this point, the analyses of the plurality, and Justice Kennedy's concurrence, merge. See *Stewart*, 388 F.3d at 1091. The plurality looked to the passage of time between the unwarned and warned statements, the location where those statements were taken, whether the same person questioned the suspect during the unwarned and warned statements, whether details obtained during the unwarned phase were used during the warned phase, and whether the suspect was advised that the unwarned statement could not be used against the suspect. *Seibert*, 542 U.S. at 616, 159 L. Ed. 2d at 657-58, 124 S. Ct. at 2612 (plurality op.). The plurality also considered whether "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Seibert*, 542 U.S. at 616-17, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613 (plurality op.).

Justice Kennedy's concurrence similarly instructed:

> "[P]ostwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. [Citations.] Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial

statement may be sufficient." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring).

The facts of this case demonstrate that sometime after 8 p.m., about two hours after defendant's oral confession, defendant's father arrived at the police station. He was permitted to speak to defendant alone. Shortly thereafter, the assistant State's Attorney met with defendant, advised him of his *Miranda* rights, and obtained defendant's handwritten statement in the presence of defendant's father, Detective Keane, and Detective Velez, who acted as an interpreter. This meeting took place in the same interview room in which defendant had spent the day. Defendant was not advised that his oral statement could not be used against him.

We recognize that defendant's handwritten statement was taken after defendant received *Miranda* warnings at least twice, that an assistant State's Attorney was doing the questioning rather than a detective, and that defendant's father was present. However, the unwarned and warned statements were taken close in time, in the same place, with Detective Keane present for both, and defendant was never advised that his oral statement would be inadmissible. Viewing all the relevant factors, we cannot conclude that a reasonable juvenile in defendant's position would have understood that he had a genuine choice about whether to continue talking to the police. We find that defendant's handwritten statement was involuntary for fifth amendment purposes pursuant to the United States Supreme Court's decision in *Seibert*. Defendant's handwritten statement should have been suppressed.

Having reached this conclusion, we need not conduct an attenuation analysis to determine whether defendant's confession was obtained through exploitation of his illegal arrest under the fourth amendment. "Indeed, if the *Fifth* Amendment has been violated, the *Fourth* Amendment issue would not have to be reached." (Emphases added.) *Dunaway*, 442 U.S. at 217, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259.

We are bound, however, to consider the double jeopardy implications of our finding that defendant's handwritten statement is inadmissible. Defendant does not raise any claims concerning the sufficiency of the evidence against him and did not assert that his conviction should be vacated outright because the State did not meet

its burden at trial. Instead, defendant seeks reversal of his conviction and remand for a new trial. Retrial, however, raises double jeopardy concerns, and we are therefore required to consider the sufficiency of the evidence against defendant. *People v. Garner*, 147 Ill. 2d 467, 483 (1992).

The double jeopardy clause prohibits retrial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding. *Burks v. United States*, 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147 (1978). It does not, however, preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction. *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990). The State cannot retry a defendant once it has been determined that the evidence introduced at trial was insufficient to sustain a conviction. *Mink*, 141 Ill. 2d at 173-74. Yet, "retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for the purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995), citing *Lockhart v. Nelson*, 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290 (1988).

In this case, defendant's conviction was set aside because of trial error. Accordingly, we consider whether the evidence presented at trial, including the now-suppressed handwritten statement, was sufficient to convict. *Olivera*, 164 Ill. 2d at 393. The relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Olivera*, 164 Ill. 2d at 396.

At trial, the State presented the testimony of Officer Block, who described the murder scene. She stated that the apartment smelled of gas, which seemed to be coming from the stove. She added that the victim was lying on his stomach on the living room floor. He had been stabbed multiple times and his head, feet, and hands were bound with duct tape. Additional evidence was presented which demonstrated that Leal's fingerprint was found on a beer bottle in the victim's apartment and that Andrade's fingerprint was found on duct tape removed from the victim's body. There was no physical evidence

-36-

linking defendant to the crime. The primary evidence against defendant was his handwritten statement, where he admitted to his participation in the crime and provided specific details that corroborated the evidence obtained at the crime scene. For example, defendant stated that the victim's hands and ankles were bound with duct tape, that Andrade held the victim down, and that the victim was stabbed while lying on his stomach. Defendant added that Leal turned the gas on the stove before leaving the apartment, but there was no flame.

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt based on his written confession, which was corroborated by physical evidence and observations made at the crime scene. Accordingly, we conclude that there is no double jeopardy impediment to retrial, and thus remand the cause to the circuit court for that purpose.

CONCLUSION

For the reasons above, we conclude that the appellate court erred in upholding the trial court's denial of defendant's motions to quash and suppress. The judgments of the trial and appellate courts are reversed. Defendant's conviction is vacated. The cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*

JUSTICE FREEMAN, specially concurring:

In its opinion, the majority holds that the 15-year-old defendant was unlawfully seized during his questioning at the police station in violation of his rights under the fourth amendment. The majority further holds that the handwritten statement made by defendant at the police station was involuntary under the fifth amendment and should therefore be suppressed. I am in agreement with both of these holdings of the majority, as well as with its remand of this cause to the circuit court for a new trial.

I write separately, however, because I part company with the majority with respect to its holding earlier in its opinion that defendant's decision to accompany the Chicago police detectives to the police station was "voluntary and not the result of coercion." Slip op. at 24. The majority holds that defendant was not unlawfully seized when he accompanied Detectives Bautista and Keene from his apartment to the police station for questioning in the murder of Hector Andradae. Although the majority states that it is appropriately modifying the reasonable person standard to inquire whether, under the facts presented, a reasonable juvenile would have believed that his freedom of movement was restricted by the detectives (slip op. at 19), it appears that it is nevertheless applying the test of a reasonable adult–rather than that of a reasonable juvenile–in determining that defendant believed that he was free to terminate the encounter with the officers.

A seizure occurs within the meaning of the fourth amendment when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). As the majority notes, this court has previously set forth several pertinent factors that may be considered when determining whether a reasonable person would have felt free to leave the presence of police officers, including: the intent of the officer; the understanding of the defendant; whether the defendant was told he was free to leave or that he was under arrest; whether the defendant would have been restrained if he attempted to leave; the length of the interrogation; and whether *Miranda* warnings were given. *People v. Melock*, 149 Ill. 2d 423, 437-39 (1992). In addition, courts have also looked to whether the defendant was told he could refuse to accompany the police; the number of police officers who sought the defendant; whether the defendant was transported to the station in a police car or arranged his own transportation; whether the defendant was placed in an interview room as opposed to a common area; and the method of interrogation. *People v. Armstrong*, 318 Ill. App. 3d 607, 613 (2000); *People v. Williams*, 303 Ill. App. 3d 33, 40 (1999); *In re J.W.*, 274 Ill. App. 3d 951, 960 (1995); *People v. Vega*, 203 Ill. App. 3d 33, 41-42 (1990).

When the defendant is a juvenile–as in the matter before us–we modify the reasonable person inquiry to ask what a reasonable *juvenile* would have believed in defendant's position. *People v. Braggs*, 209 Ill. 2d 492, 509-11 (2003). In *Braggs*, we held that this approach is animated by the firmly established legal principle that, in general, juvenile defendants are more susceptible to police coercion than adults and are likewise more susceptible to the impression that they are, in fact, in custody and unable to leave the presence of the officers. *Braggs*, 209 Ill. 2d at 508-09. The fact that a defendant is a juvenile has also led courts to consider the defendant's experience with the criminal justice system and his educational background in determining whether a reasonable juvenile would have felt free to leave. *Armstrong*, 318 Ill. App. 3d at 615; *Vega*, 203 Ill. App. 3d at 43.

Defendant asserts that he was placed under arrest–and therefore seized within the meaning of the fourth amendment–at the time that he was escorted by Detectives Bautista and Keane from his apartment to the police station, as a reasonable juvenile in his position would have perceived that he was unable to terminate the encounter with the officers and leave their presence. Defendant further contends that this seizure was illegal because, by the very admission of the State, the officers had no probable cause upon which to make an arrest of defendant at that time. I agree.

The test to be applied here is one of ordinary common sense: would a reasonable juvenile in defendant's position–with no prior contact with the legal system–have felt free to simply end the encounter with the officers when they came to his apartment? Would a reasonable juvenile placed within such a situation believe that he–rather than the detectives–was in control of the situation to the extent he was free to leave? The majority holds that he would have, but I cannot agree with this conclusion based upon the following facts.

First, defendant was not questioned briefly when he was found in his home by Detectives Bautista and Keane, even though both detectives testified that they considered defendant to be simply a "witness" in the investigation, and even though the record reveals that only defendant and Jose Leal were brought to the police station for questioning while other witnesses in the case were questioned outside

-39-

of the station. By Bautista's own testimony he told defendant "that his name had been mentioned by other people that we had talked to; that we needed to–or wanted to ask him some questions. I told him that I would prefer to ask him the questions at the Area 4 detective division, if he would come along with us." Bautista indicated a strong desire to "have the interview be conducted at Area 4" and admitted that he neither offered defendant the alternative of traveling to the police station by his own means nor told defendant that he could refuse to accompany the officers. The specter of having two detectives arrive at one's dwelling admittedly intent on transporting that person to a police station in a squad car for questioning without offering an alternate means of transportation or acknowledging that the person need not comply is inherently intimidating to a juvenile who had no previous experience with the police, and who, common sense dictates, may be more susceptible to complying with requests made by authority figures such as police officers.

Further, by Bautista's own testimony, when defendant left his apartment to go with the officers, "Detective Keane led the way down the stairs. The defendant was behind him, and I was behind the defendant." It is reasonable to believe a juvenile surrounded by officers from front and back would not feel in control and would not believe that he could simply end the encounter and refuse to accompany the detectives. Defendant was then seated alone in the back of the detective's unmarked squad car, and, according to Bautista, no conversation ensued between the time they left defendant's apartment and the time they arrived at the police station. Although defendant was not handcuffed, the totality of the circumstances made it unlikely that he would have felt free to leave the officers and return home.

It is my view that where a juvenile is involved, a court must be extra-vigilant in examining whether or not that juvenile would reasonably perceive that he or she would feel free to leave the presence of the officers, terminate the encounter and go about his or her business. My review of the facts presented in this case leads to the conclusion that the situation in which defendant found himself was physically and socially intimidating to a minor with no prior experience with the legal system. "[W]hen, as here, a mere child–an easy victim of the law–is before us, special care in scrutinizing the

record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity." *Haley v. Ohio*, 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 304 (1948).

Finally, I observe that our laws presume in a number of instances that minors lack the necessary judgment and maturity to participate in certain activities. For example, the law provides that a minor cannot enter into a contract that can legally be enforced against him (*e.g.*, *Severs v. Country Mutual Insurance Co.*, 89 Ill. 2d 515, 520 (1982)); restricts a minor's ability to drive (625 ILCS 5/6–103 (West 2006)); does not allow a minor to vote (10 ILCS 5/4–2 (West 2006)); and prohibits a minor's consumption of alcoholic beverages (235 ILCS 5/6–16(a)(i) (West 2006)). This raises the question as to why society is skeptical of a minor's judgment in certain contexts, and yet is readily willing to believe that a minor with no prior experience with the legal system is capable of making mature, rational and knowing decisions in the course of criminal proceedings, such as deciding to "voluntarily" accompany officers to the police station for questioning in a murder investigation.

For the foregoing reasons, I specially concur in the majority opinion.


JUSTICE BURKE joins in this special concurrence.