2021 IL App (1st) 180734-U

No. 1-18-0734

Order filed September 8, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16CR-12051 |
| | ) | |
| PARIS JONES, | ) | Honorable |
| | ) | Vincent Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justice Howse concurred in the judgment.
Justice Ellis specially concurred, with opinion.

**ORDER**

¶ 1    *Held*: We reverse and remand for further proceedings where the trial court failed to comply with Supreme Court Rule 431(b) by asking the prospective jurors whether they understood the principles in the rule and where the evidence was closely balanced. We also find that defendant's trial counsel was not ineffective for failing to move to suppress defendant's custodial statements on the basis that they had been obtained in violation of *Miranda*.

¶ 2    Following a jury trial, defendant Paris Jones was found guilty of the first degree murder of

Damond Avant on an accountability basis. Defendant drove the vehicle in which Tyren Reese,

Kenyon Jones (Kenyon), and Corey Griffin were passengers.[1] Defendant stayed in the vehicle while Reese and Griffin exited the vehicle and shot Avant.

¶ 3    On appeal, defendant contends that the trial court erred in failing to comply with Supreme Court Rule 431(b) (eff. Jul. 1, 2012) and *People v. Zehr*, 103 Ill. 2d 472 (1984) by failing to ask the prospective jurors if they understood the constitutional principles contained in the supreme court's decision in *Zehr* as codified in Rule 431(b). See *People v. Thompson*, 238 Ill. 2d at 598, 617 (2010) (Burke, J., dissenting, joined by Freeman, J.). Defendant also contends that his trial counsel should have filed a motion to suppress his custodial statement to police where the detectives engaged in an improper "question first, warn later" style of questioning in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). For the reasons that follow, we reverse the judgment of the circuit court and remand for further proceedings.

¶ 4                                    I. BACKGROUND

¶ 5                              A. Motion to Suppress

¶ 6    Prior to trial, defendant filed a motion to suppress his custodial statements to police. In the motion, defendant asserted that he was not able to fully appreciate and understand his *Miranda* rights because of his physical and emotional capacity and condition at the time of the interrogation. Defendant asserted that he had been in an automobile accident hours before the interview and had not received medical attention. Defendant also asserted that he had ingested alcohol and marijuana

---

[1]Defendant was indicted along with Reese and Kenyon. Prior to trial, defendant filed a motion for severance, which the trial court granted. This court has previously decided Kenyon and Reese's separate appeals. See *People v. Reese*, 2020 IL App (1st) 172830-U (unpublished order under Supreme Court Rule 23); *People v. Jones*, 2021 IL App (1st) 171623-U (unpublished order under Supreme Court Rule 23). Reese and Kenyon are not parties to this appeal.

prior to the interview. Defendant maintained that he was therefore unable to give a voluntary, knowing, and intelligent waiver of his constitutional rights.

¶ 7     At a hearing on defendant's motion, Chicago police detective Greg Swiderek testified that he conducted a recorded interview of defendant at the police station following the shooting. Detective Swiderek testified that he did not observe that defendant had any injuries and defendant did not complain of any injuries. Detective Swiderek also testified that defendant did not display any signs of impairment or smell of alcohol. Detective Swiderek interviewed defendant on several occasions throughout the day and defendant never complained of injuries, requested medical treatment, or showed signs of impairment. The State also played portions of defendant's electronic recorded interview (ERI) with Detective Swiderek.

¶ 8     In denying defendant's motion, the court noted that defendant's responses to Detective Swiderek's questions were "appropriate" and defendant did not show any signs of impairment. The court observed that Detective Swiderek testified that he did not smell alcohol and defendant did not ask for medical treatment or complain about any injuries or pain.

¶ 9                                B. *Voir Dire*

¶ 10     Prior to selecting the jury, the trial court informed the prospective jurors about some "basic principles of constitutional law" in criminal cases. In pertinent part, the court informed the jury that (1) a defendant is presumed innocent until a jury determines that he is guilty beyond a reasonable doubt; (2) the State has the burden of proving the defendant guilty beyond a reasonable doubt; (3) a defendant does not have to present any evidence at all and may rely on the presumption of innocence; and (4) a defendant does not have to testify. After reading each principle to the prospective jurors, the court asked the prospective jurors to raise their hand if they did not "accept" that particular constitutional principle. For each principle, the court noted that none of the

prospective jurors raised their hand. The court then asked the prospective jurors to raise their hand if they had any "problems or qualms" about applying each constitutional principle. Again, the court noted each time that none of the prospective jurors raised their hand.

¶ 11                                          C. Trial

¶ 12     The evidence introduced at defendant's trial showed that at 9 p.m. on December 3, 2014, Takia Martin, Avant's girlfriend, was walking with Avant in the area of West Chicago Avenue and North Mayfield Avenue. As they were walking, Martin saw two men walk out of a nearby alleyway. One of the men was "heavy set" and the other was "short and skinny." One of the men was dressed in all black and the other was wearing a black sweater and light blue jeans. Both of the men wear wearing hoods over their heads. As Martin and Avant approached the alley where Martin had seen the two men, Martin observed a burgundy truck in the alleyway. Martin and Avant continued walking past the alleyway.

¶ 13     Martin later observed the burgundy truck from the alleyway drive past them and stop behind them. Martin turned to look over her shoulder and noticed that the back door of the truck was open. Martin then heard a gunshot and saw the heavy set man dressed in all black that she had seen earlier. Avant fell to the ground. The short and skinny man then came "from the street," stood over Avant, and shot him multiple times. The two men then got into the burgundy truck and drove away.

¶ 14     Shortly after the shooting, Chicago police officer Jorge Munoz observed a burgundy SUV travelling at a high rate of speed and failing to stop at a stop sign. Officer Munoz conducted a traffic stop of the SUV and approached the driver's side of the vehicle. As he neared the vehicle, Officer Munoz observed three or four occupants in the vehicle and asked the occupants to show their hands. At that point, the driver of the vehicle "took off" and the vehicle sped away.

¶ 15    Chicago police officer Richard Corona, who was on patrol nearby, pursued the speeding vehicle. Officer Corona watched the vehicle crash into a light post. He saw multiple people run out of the vehicle after the crash. Defendant fled from the vehicle and hid under a nearby truck. Chicago police officer Paul Heyden, who was also on the scene after the SUV crash, pulled defendant out from under the truck and took him into custody.

¶ 16    Officer Heyden testified that he had known defendant for about ten years and considered him a friend. Officer Heyden transported defendant to the police station. Later that evening, Officer Heyden took defendant back to the scene to follow the route that he drove after the shooting because defendant was not sure if someone had thrown a gun out of the window of the burgundy SUV. However, Officer Heyden did not discover any guns.

¶ 17    At the police station, defendant gave an electronically recorded interview (ERI). The ERI was conducted by Detective Swiderek. Detective Swiderek testified that he introduced himself to defendant around 12:45 a.m. He told defendant that he was at the police station regarding a shooting and advised defendant of his *Miranda* rights. Defendant indicated that he understood his *Miranda* warnings and agreed to talk to Detective Swiderek. Detective Swiderek interviewed defendant throughout the early morning hours of December 4, and was also interviewing Kenyon in a separate room during that same period.

¶ 18    The ERI video was played for the jury. In the ERI, Detective Swiderek first informed defendant that he was at the police station because of a shooting. Detective Swiderek told defendant that he had to read him his *Miranda* rights. Detective Swiderek informed defendant of his *Miranda* rights and defendant indicated that he understood his rights and agreed to speak with Detective Swiderek. Defendant first denied any knowledge of a shooting, but during subsequent interviews, acknowledged that he was the driver of the burgundy SUV, which belonged to

Kenyon's girlfriend. Defendant stated that he drove because he was the only one who had a driver's license and insurance.

¶ 19    Defendant told Detective Swiderek that on the night of the shooting, he and Kenyon were driving around celebrating the life of defendant's cousin who had been shot and killed in 2010. Reese and Griffin[2] called Kenyon, and Kenyon told defendant to pick them up. Defendant stated that he did not know Reese and Griffin, but had seen them around the neighborhood. Charles Moore, defendant's cousin, was also in the vehicle. The group decided to go to the liquor store. Defendant stated that while they were at the liquor store, Reese said, "let's go see who we see bro." When Detective Swiderek asked defendant what that meant, defendant responded that "they wanted to go see who they can kill." Defendant stated he knew what they intended to do, but he lied to Detective Swiderek earlier because he was nervous and just got out of prison.

¶ 20    Defendant said the atmosphere in the car started as a celebration of his cousin's life, but the mood changed to anger as they thought about how he had been killed. Griffin told defendant to drive to the "hood," and then directed him to park the SUV near a building. Griffin left the vehicle, ran into the building, and returned a few minutes later. Defendant knew that Griffin had gone into the building to retrieve a gun. They continued driving around the area looking for rival gang members. Defendant stated that he did not see any rival gang members, but he did see some "females." He told Detective Swiderek, however, that he was "not finna kill no girls." Eventually, Reese told defendant to circle the block and then told him to stop the vehicle. Defendant did not see anyone when Reese told him to stop the vehicle, but he stopped the car where Reese indicated and left the vehicle in drive. He told Detective Swiderek that he left the vehicle in drive because

---

[2]Defendant referred to Griffin as "YB" or "Coasta."

he knew what Reese was going to do and he wanted to be able to make a quick escape. Kenyon handed Reese a silver 9 millimeter automatic pistol that Kenyon retrieved from the vehicle's center console. Defendant told the detectives that Kenyon's girlfriend bought the gun and Kenyon had shown it to defendant two days earlier. Defendant knew the gun was in the vehicle when he got into the car even though he did not see it until Kenyon gave the gun to Reese. Reese and Griffin then put their hoods up and exited the vehicle.

¶ 21    Defendant did not see the shooting, but he knew Reese and Griffin shot someone because he heard between 11 and 14 gunshots from two different guns. Defendant heard the gunshots from the 9 millimeter gun Kenyon gave to Reese and from a second gun of a smaller caliber. When Reese and Griffin returned to the vehicle, Griffin said "man[,] I just killed that b****" and "I just shot him in his s***." Defendant then sped away from the area. While driving away, defendant failed to stop at a sign. A police car pulled the vehicle over and defendant stopped the vehicle. Kenyon and the others in the car told defendant to keep driving so he sped away as the officer approached the vehicle. Defendant said that while they were being chased by police, Griffin and Reese kept trying to open up the vehicle's doors. Defendant believed they were either trying to get out of the vehicle or were trying to throw the guns out of the vehicle. Defendant then crashed the vehicle and was subsequently arrested.

¶ 22    Evidence technicians from the Chicago Police Department (CPD) recovered fired cartridge casings from the scene of the shooting and recovered a fired bullet from Avant's body at the hospital. A CPD forensic investigator recovered three guns and a firearm magazine from the burgundy SUV. Two of the guns were nine millimeter handguns and the other was a .25 caliber handgun. One of the nine millimeter handguns matched the automatic pistol defendant described as belonging to Kenyon's girlfriend. The parties stipulated that a forensic scientist would testify

that the recovered cartridge cases and bullet fragments recovered from the scene and Avant's body were from the 9 millimeter handguns.

¶ 23    Defendant testified on his own behalf that on December 3, he and his friends were celebrating the birthday of his cousin Brandon, who had been killed several years prior. After setting up a memorial for Brandon, defendant met up with Moore, Kenyon, Griffin, and Reese. Defendant had been drinking alcohol that day, and they decided to go a to a liquor store to purchase more alcohol. They all got into a Chevrolet Suburban that belonged to Kenyon's girlfriend. Defendant drove because he was the only person in the vehicle with a license and insurance. Defendant testified that they listened to music in the vehicle and the atmosphere was "[j]ust a bunch of people that knew each other just around each other." After purchasing liquor, defendant drove the vehicle back toward the area of the memorial.

¶ 24    Defendant noticed the gas tank on the vehicle was low, so he started to drive toward a gas station. Before he reached the gas station, Reese, who was sitting in the back seat, told defendant to turn and then directed defendant to drive around the block. Reese then instructed defendant to park the car, which defendant did. Defendant then started talking with Kenyon who was sitting in the passenger seat. Reese and Griffin exited the vehicle and told defendant that they would be right back. Defendant did not see where they went after they left the vehicle and defendant had not seen anyone in the vehicle with a gun.

¶ 25    Defendant then heard several gunshots and heard more than one gun being fired. Reese and Griffin got back into the car and defendant drove away "pretty fast." Defendant testified that he was scared because he did not know where the shots had come from. As defendant was driving away, Griffin said "I just shot him in his s***. I killed him." Defendant then drove the vehicle through an intersection without stopping at a stop sign. A police officer conducted a traffic stop of

the vehicle and defendant pulled the vehicle over to the side of the road. As the officer approached the vehicle, Reese and Griffin pulled guns out their "hooded sweatshirts" and tried to throw the guns into the front seat of the vehicle. Defendant testified that was the first time he had seen anyone in the vehicle with a gun that night. He acknowledged that one of the guns was the automatic pistol that Kenyon had shown him two days prior. Reese and Griffin told defendant to not pull over and not stop the vehicle.

¶ 26    Defendant sped off and the next thing he remembered was crashing the vehicle. Defendant testified that he was not wearing a seatbelt at the time of the crash and the airbags deployed. Defendant testified that his legs were "wobbly" when he got out of the vehicle. He ran until his legs "gave out" and then he fell to the ground and rolled under a nearby truck. Defendant stayed under the truck until officers pulled him out and arrested him.

¶ 27    Officers transported defendant to the police station and placed him in an interview room. Defendant testified that he was in the interview room for about 30 minutes before "Officer Hall" came and spoke to him for about 15 minutes. Detective Swiderek then came into the room and introduced himself to defendant. Detective Swiderek spoke to defendant for about three minutes. He told defendant that he was there for questioning regarding a shooting and that they were going to test his hands and clothes for ballistics evidence. Defendant was then moved to a second interview room where he sat alone for a couple hours. Detective Swiderek and his partner then came into the room and interviewed defendant.

¶ 28    Defendant believed during the interview that Detective Swiderek was trying to be his "friend" and "wanted to get his case solved." Defendant believed that Detective Swiderek wanted him "to place those guns in the hands of the person who fired them." Defendant testified, however, that he did not see any guns that night before the shooting. Defendant testified that he did not tell

the truth in the ERI because Detective Swiderek did not seem to believe his "story." Defendant felt that he had to keep talking to get Detective Swiderek on his side because he wanted Detective Swiderek to know that defendant did not "do anything to anyone." Defendant wanted to "place the blame on who the blame was to be placed on as much as possible." Defendant testified that he lied about certain things in the interview with Detective Swiderek because he wanted Detective Swiderek to believe him "as much as possible." Defendant testified that despite what he said in the ERI, he never intended to help anybody in the vehicle commit a shooting, and he never saw Reese or Griffin with guns before they got out of the vehicle that night. Defendant also denied being given a mattress and denied sleeping in the interview room.

¶ 29    In rebuttal, Detective Swiderek testified that defendant was given a mattress around 4:30 p.m. while he was in the interview room. Defendant fell asleep on the mattress and Detective Swiderek had to wake defendant up so that he could interview him around 6:15 p.m. Counsel played portions of the ERI video for the jury which showed the detectives providing defendant with the mattress and showed defendant lying on the mattress.

¶ 30    Following closing argument, the jury found defendant guilty of the first degree murder of Avant. The court subsequently sentenced defendant to 30 years' imprisonment. Defendant now appeals.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, defendant contends that the trial court erred during *voir dire* when it failed to ask the prospective jurors whether they understood the constitutional principles it explained, instead asking the jurors only whether they accepted the principles and whether they had any "problems or qualms" with applying the principles. Defendant also contends that although his trial counsel did file a motion to suppress his custodial statements, trial counsel was nonetheless

ineffective because counsel should have raised a claim in the motion to suppress that his statements should have been suppressed because the detectives engaged in an improper "question first, warn later" style of questioning in violation of *Seibert*, 542 U.S. 600.

¶ 33                                     A. Rule 431(b)

¶ 34    Defendant first contends that his case should be remanded for a new trial because the trial court failed to comply with *Zehr* and Rule 431(b) when it did not ask the prospective jurors if they understood the constitutional principles outlined by the rule. We review the trial court's compliance with Rule 431(b) *de novo. People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 35    Rule 431(b) requires the trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts" four constitutional principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her. Ill. S. Ct. R. 431(b) (eff. Jul. 1, 2012); see also *Zehr*, 103 Ill. 2d at 477. ("essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him."). Rule 431(b) imposes "an affirmative *sua sponte* duty on the trial court to ask potential jurors in each and every case whether they understand and accept the *Zehr* principles" and requires the trial court to give each venireperson an opportunity to respond whether he or she understands and accepts those principles. *People v. Magallanes*, 409 Ill. App. 3d 720, 729-30 (2011).

¶ 36    In this case, defendant contends that the trial court failed to ask the prospective jurors whether they "understood" the principles, instead asking the jurors only whether they accepted them and whether they had any "qualms" or "problems" with applying them. Defendant concedes that he failed to preserve this issue for review by failing to object at trial and failing to raise the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He nonetheless contends that we may review the error under the plain error doctrine because the error was clear and obvious and the evidence was closely balanced.

¶ 37    The plain error rule allows a reviewing court to consider unpreserved claims of error regardless of forfeiture. *Thompson*, 238 Ill. 2d at 613. Plain error applies when there is a clear or obvious error and the evidence is so closely balanced that the error would change the outcome of the case or when there is a clear or obvious error that is so serious that it affected the fairness of defendant's trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first consideration in addressing defendant's plain error argument is determining whether an error occurred, which requires a "substantive look" at the issue. (Internal quotation marks omitted.) *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 38    Here, the trial court instructed the prospective jurors on the *Zehr* principles one at a time. After informing the prospective jurors of each principle, it asked the prospective jurors to raise their hand if they did "not accept" the constitutional principle. After confirming that none of the prospective jurors raised their hands, the court then asked the prospective jurors to raise their hand if they had "qualms or problems about applying" each constitutional principle. The court therefore did not ask the jurors whether they "understood" the *Zehr* principles. The State acknowledges that the court did not use the "express language" from the rule, but asserts that the court's terminology was nonetheless sufficient to ascertain whether the prospective jurors understood the constitutional

principles. The State maintains that a juror's inability to understand one of the principles would constitute a "problem."

¶ 39     Despite the State's assertions to the contrary, our supreme court has previously rejected a similar argument. In *People v. Sebby*, 2017 IL 119445, ¶ 8, the trial court asked the prospective jurors whether any of them "[h]ad any problems" with or "believe[d] in" the *Zehr* principles. (Internal quotation marks omitted.) The supreme court found that this phrasing by the trial court did not comply with Rule 431(b) and represented clear error. *Id.* ¶ 49; see also, *People v. Wilmington*, 2013 IL 112938, ¶ 32 ("While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself.") (Emphasis in original); *Thompson*, 238 Ill. 2d at 607. As in *Selby*, we find the trial court's terminology in this case asking the prospective jurors if they had any "qualms or problems" with the *Zehr* principles, rather than asking them if they understood those principles failed to satisfy Rule 431(b).

¶ 40     Having found an error occurred, we must next consider whether reversal is warranted. As noted, reversal may be warranted under plain error when there is a clear or obvious error and (1) the evidence is so closely balanced that the error would change the outcome of the case, or (2) the error is so serious that it affected the fairness of defendant's trial. *Piatkowski*, 225 Ill. 2d at 565. Defendant does not argue that the error in this case amounted to second-prong plain error. See *Sebby*, 2017 IL 119445, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury.") (citing *Wilmington*, 2013 IL 112938, ¶ 33 ("[T]he second prong of plain-error review does not provide a basis for excusing defendant's procedural default" of a Rule 431(b) violation.) He asserts, however,

that the court's error in failing to ask the prospective jurors if they understood the *Zehr* principles amounted to first-prong plain error because the evidence in this case was closely balanced.

¶ 41    Whether the evidence is closely balanced is a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge. *Piatkowski*, 225 Ill. 2d at 566. In determining whether the evidence was closely balanced, a reviewing court must make a "commonsense assessment" of the evidence. *Belknap*, 2014 IL 117094, ¶ 52. To show that the evidence was closely balanced, a defendant must show that the error was prejudicial, *i.e.*, that the error alone severely threatened to tip the scales of justice against him. *People v. Adams*, 2012 IL 111168, ¶ 21 (quoting *Herron*, 215 Ill. 2d at 187).

¶ 42    In this case, defendant was charged with first degree murder on an accountability basis. See 720 ILCS 5/9-1 (West 2014); 720 ILCS 5/5-2 (West 2010). As such, the State was required to show that defendant "either before or during the commission of [the first degree murder], and with the intent to promote or facilitate that commission, [] solicit[ed], aid[ed], abet[ed], agree[d], or attempt[ed] to aid that other person in the planning or commission of the offense." See 720 ILCS 5/9-1 (West 2014); 720 ILCS 5/5-2(c) (West 2010).

¶ 43    Defendant argues that the evidence in this case was closely balanced because the sole issue was whether defendant knew that anyone in the vehicle was planning to shoot someone or that defendant knowingly abetted them. Defendant asserts that the only direct evidence suggesting that defendant knowingly abetted the others in the vehicle in the shooting came from his ERI statement to police. Defendant contends that his trial testimony directly contradicted the statements he made in the ERI. He asserts that the case therefore amounted to a "credibility contest" between his testimony at trial and his recorded interview with police.

¶ 44    A credibility contest occurs when State and defense witnesses present two plausible opposing accounts of the events and no extrinsic evidence corroborated or contradicted either version so that the conviction necessarily rested upon the credibility of the witnesses. *People v. Moon*, 2020 IL App (1st) 170675, ¶ 50 (citing *Sebby*, 2017 IL 119445, ¶¶ 61-63). However, there is no credibility and the evidence is not closely balanced, " 'when one party's version of events is unrefuted, implausible, or corroborated by other evidence.' " *Id.* (quoting *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 48).

¶ 45    The State asserts that the evidence in this case was not closely balanced because defendant's ERI testimony was "plausible" and corroborated whereas his trial testimony implausible and inconsistent. The State contends that defendant's ERI statements were consistent and detailed and exhaustively described the series of events defendant relayed to Detective Swiderek about the route he drove, the attempted traffic stop after defendant drove through the stop sign, and the subsequent crash and arrest. However, none of these events represent a contested issue. Indeed, defendant described the exact same set of circumstances at trial. The only question is whether defendant knew that anyone in the vehicle had a gun and knew that Reese and Griffin intended to shoot someone when they got out of the vehicle. There was no other evidence, aside from defendant's own statements, to show whether defendant was aware that Reese and Griffin intended to murder Avant. Neither account defendant gave was "unrefuted, implausible, or corroborated by other evidence." Thus, defendant's conviction rested entirely on whether the jurors believed defendant's statements in his ERI or whether they believed his testimony at trial. As such, we find that the evidence in this case was closely balanced.

¶ 46    We also observe that defendant's statements during the ERI were anything but consistent. He first denied knowing anything about the shooting, telling Detective Swiderek that he only heard

gunshots and then drove away. Even after he acknowledged that he knew the shooting occurred, his description of the events and his relationship to the participants changed drastically throughout the interrogation. For instance, defendant initially denied seeing either Reese or Griffin with guns, then told Detective Swiderek that he saw both of them produce guns from underneath their hooded sweatshirts. He eventually told Detective Swiderek that Griffin directed defendant to a building where Griffin retrieved a gun and defendant saw Kenyon hand Reese a gun just before the shooting. After hours of interrogation, defendant eventually told Detective Swiderek that he knew there were guns in the vehicle and he knew that Reese and Griffin intended to shoot someone when they exited the vehicle. He recanted that statement, however, at trial, testifying that he lied to Detective Swiderek because he wanted Detective Swiderek to believe him "as much as possible."

¶ 47    The State also asserts that defendant's ERI statements were adequately corroborated. The State points out that defendant's description of the alcohol they purchased at the liquor store was corroborated when the evidence technicians discovered those same alcohol bottles in the vehicle. The State contends that defendant's statements about where the shooting took place and who the shooters were was also corroborated by Martin's testimony. Again, however, none of this corroboration goes to the central question of whether defendant knew Reese and Griffin had guns and whether he knew they intended to shoot someone when they got out of the vehicle. Defendant acknowledged in his trial testimony the location where Griffin and Reese got out of the vehicle, hearing gunshots, and the high speed chase that followed.

¶ 48    Thus, because the evidence was closely balanced, the court's instructional error in failing to ask the prospective jurors if they understood the *Zehr* principles was prejudicial. *Sebby*, 2017 IL 119445, ¶¶ 68-69. As such, we find that remand for a new trial is warranted where there was a clear Rule 431(b) violation and the trial evidence was close. *Id.* ¶ 78.

¶ 49                    B. Question-First, Warn-Later

¶ 50    Although we find that remand is warranted, we will nonetheless address defendant's contention that his trial counsel provided ineffective assistance because we find that this issue would likely recur on remand. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 56. Specifically, defendant contends that his trial counsel provided ineffective assistance in failing to file a motion to suppress his custodial statement on the basis that the police used an improper question-first, warn-later tactic in violation of *Seibert*, 542 U.S. 600 and our supreme court's ruling in *People v. Lopez*, 229 Ill. 2d 322 (2008). Defendant asserts that certain statements he made during the ERI demonstrated that he made unrecorded and unwarned statements to Detective Swiderek before the recorded interview. Defendant asserts that trial counsel should have filed a motion to suppress his statements based on this improper questioning technique, but counsel failed to do so.

¶ 51    In order to better understand the Supreme Court's ruling in *Seibert*, and our supreme court's ruling in *Lopez*, it is first necessary to examine the Supreme Court's ruling in *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, police officers arrived at the defendant's house with a warrant for his arrest. *Id.* at 300. One of the officers stayed with the defendant while the other officer spoke to defendant's mother in a separate room about the arrest. *Id.* at 300-01. The officer who stayed with the defendant testified that he asked defendant if he knew why the officers were there. *Id.* at 301. The defendant stated that he did not, and then the officer asked the defendant if he knew "a person by the name of Gross," who was the victim of the robbery the police were investigating. *Id.* The defendant responded that he did know Gross and added that heard there had been a robbery at the Gross house. *Id.* The officer told the defendant that he "felt" that the defendant was involved in the robbery. *Id.* The defendant acknowledged that he was at the robbery. *Id.* The officers then escorted the defendant to their patrol vehicle. *Id.*

¶ 52    The defendant was taken to the police station where he was for the first time given his *Miranda* warnings. *Id.* The defendant indicated that he understood his rights, waived them, and gave a written statement to police about the robbery. *Id.* at 301-02. At the defendant's trial, the prewarning statement the defendant made to the arresting officer was suppressed. *Id.* at 302. However, the defendant's postwarning, written confession was admitted into evidence. *Id.*

¶ 53    On appeal to the Supreme Court, the Court considered whether the suppression of the postwarning statement was warranted. *Id.* at 303. The court agreed that the first unwarned statement should have been suppressed, but found that the admissibility of the subsequent statement "should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. The court reasoned that "[t]here is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case." *Id.* at 312. The court concluded:

> "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* at. 314.

¶ 54    The Supreme Court revisited *Elstad* in *Seibert*. In *Seibert*, the police arrested the defendant and took her to an interrogation room at the police station. *Seibert*, 542 U.S. at 604. The police

then questioned her for "30 to 40 minutes" and squeezed her arm while attempting to coerce her to make incriminating statements. *Id.* at 604-05. After the defendant made an incriminating statement, the officer gave her a 20-minute break. *Id.* at 605. After the break, the officer returned, turned on a tape recorder, and gave the defendant her *Miranda* warnings, which she waived. *Id.* The officer then confronted her with her prewarning statements, asking her to confirm everything she had already told the officers. *Id.*

¶ 55    At her trial, the defendant sought to suppress her statements. *Id.* The interrogating officer testified that "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give warnings, and then repeat the question 'until I get the answer that she's already provided once.' " *Id.* at 605-06. The trial court suppressed the prewarning statements, but admitted the responses given after the *Miranda* warnings. *Id.* at 606.

¶ 56    In a plurality opinion, the Supreme Court distinguished *Elstad* finding that the prewarning statement elicited by the police in that case was obtained "in arguably innocent neglect of *Miranda*." *Id.* at 614-15. The Court found that conversation between the defendant and the arresting officer in *Elstad* was a "good-faith *Miranda* mistake," which was "open to correction by careful warnings before systematic questioning." *Id.* at 615. The Court observed that the contrast between the facts in *Elstad* and in *Seibert* revealed a series of factors for a court to consider in determining whether warnings delivered after questioning could be effective enough to protect the defendant's rights:

> "The completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the

first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.*

¶ 57    The plurality found that the facts here demonstrated a police strategy designed to undermine *Miranda* warnings. *Id.* at 616. "The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.* The plurality concluded that because the question-first, warn-later tactic threatened to thwart *Miranda's* purpose, the defendant's postwarning statements were inadmissible. *Id.* at 617.

¶ 58    Justice Kennedy wrote a concurrence agreeing with plurality's conclusion, but applying a somewhat narrower test. *Id.* at 618-22 (Kennedy, J. concurring). In *Lopez*, our supreme court found that Justice Kennedy's concurring opinion in *Seibert* resolved the case on the narrowest ground and therefore was the controlling authority. *Lopez*, 229 Ill. 2d at 360. In his concurring opinion, Justice Kennedy recognized that not every violation of *Miranda* requires suppression of the evidence obtained. *Seibert*, 542 U.S. at 618. "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated ***." *Id.* at 618-19. Justice Kennedy also discussed *Elstad* finding that it was "correct in its reasoning and its result," but, as the plurality, found that *Seibert* presented "different considerations." *Id.* at 620. Justice Kennedy found that the two-step questioning technique the officer employed was based on a deliberate violation of *Miranda*. *Id.* The officer then relied on the defendant's prewarning statements to obtain the postwarning statement used against her at trial. *Id.* at 621. Justice Kennedy noted that the postwarning interview resembled a "cross-examination" where the officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them. *Id.*

¶ 59   Justice Kennedy found, however, that the test employed by the plurality was "too broad[]" because it envisioned an objective inquiry from the perspective of the suspect and applied in cases of both intentional and unintentional two-step interrogations. *Id.* at 621-22. Justice Kennedy stated that the admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the police deliberately employed a two-step strategy. *Id.* at 622. If officers deliberately employ a two-step strategy, then the admissibility of the postwarning statements that are related in substance to prewarning statements depends on whether the officers take curative measures before the postwarning statement is made. *Id.* "Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* As an example, Justice Kennedy noted that a "substantial break in time" would suffice to distinguish the two contexts of the interrogation.

¶ 60   Our supreme court first had an opportunity to examine *Seibert* in *Lopez*, 229 Ill. 2d 322. In *Lopez*, police responded to a burglary and found a dead body on the floor of an apartment. *Id.* at 324. The defendant gave both an oral and a written statement confessing to his part in the crime. *Id.* at 325. Prior to trial, the defendant filed motions to quash his arrest and suppress his oral and written statements. *Id.* At the hearing on his motion, the evidence showed that while investigating the victim's murder, the officers learned of defendant's name. *Id.* The officers went to defendant's apartment and took him into custody. *Id.* The officers did not tell defendant that they were investigating a homicide, but told him that wanted to ask him questions about gangs. *Id.* at 325-26.

¶ 61   At the police station, the defendant was placed in an interrogation room where the officers questioned him about the murder. *Id.* at 326. The defendant was questioned for 15 to 20 minutes without being given his *Miranda* warnings. *Id.* at 332. Nearly five hours later, detectives again

interviewed the defendant at the police station, but still did not inform him of his *Miranda* rights. *Id.* at 333. In the intervening hours, defendant's co-offender had given a statement to police implicating both himself and the defendant in the crime. *Id.* Confronted with this information, the defendant made an oral statement implicating himself in the crime. *Id.* 334. After the defendant gave the inculpatory statement, the officers gave defendant his *Miranda* warnings for the first time and then terminated the interview. *Id.* The defendant later gave a handwritten statement of his involvement in the murder. *Id.* at 341. The trial court granted the defendant's motion to suppress with regard to the oral statement he made before he was given his *Miranda* warnings, but found that his handwritten statement was voluntarily given and sufficiently attenuated from the oral statement. *Id.* at 341-42.

¶ 62    On appeal, this court rejected the defendant's assertion that the police violated his fifth amendment rights when they engaged in an unlawful question first, warn later interrogation technique. *Id.* at 344. This court reasoned that there was no evidence that the detectives intentionally withheld *Miranda* warnings in order to secure a confession from the defendant. *Id.*

¶ 63    Before the supreme court, the defendant likewise asserted that his handwritten confession was involuntary and should have been suppressed under *Seibert*. *Id.* at 355. After reviewing the Supreme Court's rulings in *Elstad* and *Seibert*, the *Lopez* court found that the threshold question was whether the detectives deliberately engaged in a question first, warn later technique when interrogating the defendant. *Id.* at 360. If the court found deliberateness, it would then have to examine whether curative measures were taken. *Id.* at 360-61. The court recognized that officers will rarely admit on the record that they deliberately withheld *Miranda* warnings in order to obtain a confession and therefore looked to the Ninth Circuit's opinion in *United States v. Williams*, 435 F.3d 1148 (2006) for guidance. *Id.* at 361. In *Williams*, the Ninth Circuit stated that, "in

determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Williams*, 435 F.3d at 1158. In assessing objectivity, the *Williams* court identified the same factors as those identified by the Supreme Court in *Seibert*, "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Id.* at 1159.

¶ 64　　In examining the subjective and objective factors, the *Lopez* court noted that the defendant's co-offender was taken into custody after giving a statement implicating both himself and defendant in the crime. *Lopez*, 229 Ill. 2d at 363. The court found that the co-offender's statement was sufficient to elevate his status from that of witness to suspect and thus, after the statement, the defendant must have also been a suspect. *Id.* The court noted that the detective testified that the defendant was not a suspect at that point, but the court found the detective's testimony contradictory. *Id.* The court noted that although the detective testified that the defendant was not a suspect after the police obtained the inculpatory statement from the co-offender, the detective also testified that the defendant was nevertheless not free to leave the police station at that point. *Id.* The court found that "[i]n light of these facts, we can think of no legitimate reason why the detectives failed to give defendant his *Miranda* warnings [after obtaining the co-offender's confession], other than a deliberate decision to circumvent *Miranda* in hopes of obtaining a confession, which would ultimately lead to a handwritten statement." *Id.* at 363-64. The court observed that this was not a case where the officers mistakenly withheld *Miranda* warnings because the detectives were clearly interrogating the defendant as they confronted him with his co-offender's statement and asked him if he was involved in the crime. *Id.* at 364. Accordingly,

the court found that the record showed that the detectives deliberately withheld *Miranda* warnings from the defendant and that his postwarning statement should have been suppressed. *Id.* at 364.

¶ 65    That precedent in mind, we now turn to defendant's contentions under *Seibert*. Defendant asserts that his use of "like I told you" at the beginning of the ERI with Detective Swiderek suggests some sort of unrecorded and unwarned questioning must have taken place. Defendant points out that when the video recording begins, defendant is sitting on a bench in the interview room. Detective Swiderek then comes into the room, unchains defendant from the bench, and then walks him out of the room. Defendant and Detective Swiderek then reenter the room a short time later, and Detective Swiderek tells defendant to sit down and wait. Detective Swiderek then leaves the room, returns less than a minute later with a chair, and advises defendant of his *Miranda* rights. Detective Swiderek then asks defendant "what's going on tonight?" Defendant replies: "Well, when you first came in and talked to me like I told you Ken is my big cousin." Defendant's use of the phrase "like I told you" is the basis for his contention that Detective Swiderek improperly elicited a prior unwarned statement from him. Defendant identifies two other instances during the ERI where he refers to this prior interrogation. Shortly after this first statement, defendant told Detective Swiderek: "like I told you, I just came home but I know people from the area," and soon after defendant said: "Like I told you I just did six and a half years." Defendant asserts that the prewarning interrogation where Detective Swiderek elicited this information must have occurred during the period defendant was removed from the interrogation room.

¶ 66    Based on defendant's contentions and the statements he made during the ERI, this questioning apparently concerned the fact that "Ken," referring to Kenyon, was his cousin, and that defendant had just recently been released from prison. Even assuming such prewarning questioning occurred, we cannot say that the circumstances described by defendant indicate a

specific strategy designed to undermine *Miranda* warnings such that trial counsel should have filed a motion to suppress his statements on that basis. See *Seibert*, 542 U.S. at 615. Quite simply, the series of events defendant asserts occurred in this case does not resemble the clearly improper police tactics employed in *Seibert* and *Lopez*, but more closely mirrors the innocent prewarning conversation that took place in *Elstad*.

¶ 67 First, in *Seibert*, the detectives physically coerced the defendant before reading her *Miranda* rights in order to extract incriminating information from her. *Seibert*, 542 U.S. at 604-05. The detective at the defendant's suppression hearing acknowledged that he intentionally withheld *Miranda* rights in order to get the answers he wanted postwarning. *Id.* at 605-06. *Seibert* thus represents an extreme and obviously improper example. Notably, in this case, defendant offered no suggestion of what questions Detective Swiderek might have asked him at this off-camera prewarning "interrogation," and there is no suggestion that defendant even informed his counsel that such an interrogation took place. Indeed, defendant testified at length at trial regarding the interrogation with Detective Swiderek and did not mention any prewarning questioning. Instead, defendant seems to suggest that the existence of the prewarning interrogation is apparent merely from his responses to Detective Swiderek's questions, namely his use of the phrase "like I told you."

¶ 68 We observe that at the very beginning of the interrogation, after Detective Swiderek informed defendant of his *Miranda* rights, and immediately after defendant told Detective Swiderek that Kenyon was his cousin, defendant then says, "I just came home September eighteenth." Later, defendant tells Detective Swiderek "like I told you I just came home" and "[l]ike I told you I just did six and a half years." Thus, defendant's use of "like I told you" in this context in reference to his recent release from prison may have been referencing his previous

statement from the beginning of the interrogation that defendant just "came home" on September 18 and may not have been a reference to an unrecorded prewarning statement as defendant suggests.

¶ 69    Nonetheless, even taking defendant's assertions on appeal that some sort of improper prewarning interrogation must have occurred as true, we cannot say that suppression would be warranted in this case. As the Supreme Court noted in *Seibert*, not every violation of *Miranda* requires suppression of the evidence obtained. *Seibert*, 542 U.S. at 618. In this case, there is no suggestion of a concerted effort by Detective Swiderek to elicit a prewarning confession as in *Lopez*. *Lopez*, 229 Ill. 2d at 363-64. And there was simply not the deliberateness that was employed in both *Lopez* and *Seibert*. As there was no deliberateness, it was not necessary for the officers to take curative measures. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring); see also *Lopez*, 229 Ill. 2d at 359.

¶ 70    Moreover, the postwarning interview did not resemble a "cross-examination" where the detectives confronted defendant with his prewarning statements and pushed him to acknowledge them. *Id.* at 621 (Kennedy, J., concurring). Instead, Detective Swiderek began the interview with an open-ended question: "You want to tell me what's going on tonight?" Detective Swiderek did not even attempt to elicit any of the information that defendant allegedly said in the prewarning interview. Detective Swiderek did not ask defendant about his relationship with Kenyon, or mention Kenyon at all, and did not ask defendant about any prior incarcerations. Instead, defendant offered that information on his own accord. Thus, we find that the circumstances in *Seibert* and *Lopez* are distinguishable from the case at bar.

¶ 71    Instead, we believe that *Elstad* is the proper guide here. As Justice Kennedy noted in *Seibert*, *Elstad* was "correct in its reasoning and its result." *Id.* Like in *Elstad*, Detective Swiderek

did not employ "physical violence or other deliberate means calculated to break" defendant's will. *Elstad*, 470 U.S. at 312. The mere fact that defendant made an unwarned statement does not warrant a presumption of compulsion and does not invalidate subsequent administration of *Miranda* warnings followed by a knowing and voluntarily waiver of those rights. *Id.* at 314. The *Seibert* plurality described the circumstances in *Elstad* as a "good-faith *Miranda* mistake" that was "open to correction by careful warnings before systematic questioning" and posed "no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615. We find the same result is warranted in this case.

¶ 72     Furthermore, it is not even clear that the information Detective Swiderek allegedly elicited in the prewarning interrogation was even incriminating. Defendant asserts that the information was incriminating because Kenyon had just been arrested for murder and the fact that defendant was his cousin linked them together. However, defendant and Kenyon were arrested at the same time, fleeing from the same vehicle, shortly after the shooting, and were being interrogated during the same period by the same detective regarding the same incident. The fact that Kenyon was defendant's cousin had little bearing, if any, on whether the two were involved in the same criminal activity. Furthermore, the fact that defendant had recently been released from prison was irrelevant to the subject of the interrogation.

¶ 73     Accordingly, it is clear that a motion to suppress on the basis that the detectives violated *Miranda* by employing an improper question first, warn later tactic would have been meritless. Even taking defendant's contentions that a prewarning interrogation occurred as true, the hallmark factors of a deliberate attempt to circumvent *Miranda* identified by the Supreme Court in *Seibert* and our supreme court in *Lopez* were simply not present in this case. As such, we find that trial counsel was not ineffective for failing to raise the issue in a motion to suppress.

¶ 74                                    III. CONCLUSION

¶ 75    For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand for further proceedings.

¶ 76    Reversed and remanded.

¶ 77    Ellis, J., specially concurring.

¶ 78    I concur in the well-reasoned judgment of reversal based on the Rule 431(b) violation. But I respectfully submit that we should not reach the question of whether the failure to file a motion to suppress constituted ineffective assistance of counsel. It is not only unnecessary to do so; it is prejudicial to defendant.

¶ 79    We often reach issues unnecessary to the disposition of an appeal because they are likely to recur on remand. Evidentiary issues, for example, that almost inevitably will crop up again at a retrial. But it is not inevitable that this *Strickland* issue will recur. To be sure, the decision whether to move to suppress will arise again. But for all we know, defense counsel, on remand, will move to suppress based on a *Seibert* violation, as defendant argues here they should have.

¶ 80    By reaching this issue unnecessarily, we are sending two messages we should not be sending. First, we are telling the defense attorneys that, should they choose not to move for suppression, that decision will not be ineffective assistance. We are needlessly weighing in on counsel's strategic decision after consultation with their client. And second, we have told both defense counsel and the trial judge that, even if defense counsel does move for suppression, that motion will be a loser.

¶ 81    And because a new trial is forthcoming, we are doing as an appellate court what our supreme court has held the circuit court cannot do—decide a *Strickland* claim prior to trial. See *People v. Jocko*, 239 Ill. 2d 87, 93 (2010) ("the fundamental problem with addressing *Strickland*

claims prior to trial is that the outcome of the proceeding has not yet been determined. Because there is no way to determine if counsel's errors have affected an outcome that has not yet occurred, the circuit court cannot engage in this analysis prior to trial. Accordingly, we reject the appellate court's conclusion that a circuit court is obligated to address a *pro se* defendant's *Strickland* claims prior to trial.").

¶ 82    The majority does a perfectly fine job of providing its best estimation of the validity of that suppression motion, but it is just that—an estimate on direct appeal, without the benefit of a transcript with sworn testimony and argument from a suppression hearing specifically focused on *Seibert*. It may well be that the majority's analysis proves to be entirely correct. But the fact remains that, if defendant did move to suppress at retrial and provided evidence to the court in the form of sworn testimony, nobody can say for certain what will come of it. Perhaps some information that has not yet come to light will come out at a suppression hearing specifically focused on the *Seibert* issue, and it might make a material difference. There is a possibility that defendant may persuade the judge, after hearing all evidence and testimony and argument, that suppression is warranted.

¶ 83    The majority decision inadvertently places a heavy thumb on the scale before that happens, if it happens. It unintentionally steers the defense attorneys toward a decision not to file a suppression motion by giving them cover in advance. And it gives our best estimate of the merits of the *Seibert* claim before defendant has had a chance to tailor an argument and call witnesses at a hearing directly focused on that issue.

¶ 84    I otherwise concur in the well-reasoned judgment of reversal based on the *Zehr* violation and would leave it at that.